In re Gordon ZWAGERMAN and Joan Zwagerman, d/b/a Zwagerman Farms, Debtors.

James D. ROBBINS, Trustee, Plaintiff,

v.

COMERICA BANK–DETROIT, Red River Company, David Bradley, the United States of America, Acting Through the Farmers Home Administration, Defendants.

Bankruptcy No. NG 85–02901.
Adv. No. 86–375.

United States Bankruptcy Court,
W.D. Michigan.

June 19, 1990.

---

542

Varnum, Riddering, Schmidt & Howlett (Robert A. Hendricks, and William E. Rohn), Grand Rapids, Mich., for plaintiff.

Miller, Canfield Paddock & Stone (Robert F. Wardrop, II), Grand Rapids, Mich., for defendant Comerica Bank–Detroit.

Hunter M. Meriwether, Grand Rapids, Mich., for defendants Red River Co. and David Bradley.

Visser & Bolhouse (Donald R. Visser), Grand Rapids, Mich., for debtors Gordon Zwagerman and Joan Zwagerman.

## OPINION

DAVID E. NIMS, Jr., Bankruptcy Judge.

This case comes before the court on the complaint filed by James D. Robbins, the Trustee in this estate, for a determination as to the respective interests in proceeds from the sale of cattle present on the farm of Gordon and Joan Zwagerman, doing business as Zwagerman Farms, the Debtors herein, at the time of the filing of the petition and also to recover preferential transfers by the Debtors to the Defendant David Bradley, doing business as the Red River Company. The United States, one of the Defendants, took no part in the trial and apparently makes no claim to the cattle.

## FACTS

Gordon and Joan Zwagerman filed their Chapter 7 bankruptcy petition on December 30, 1985. Other than at a 341 Meeting held on February 5, 1986, the Debtors have refused to testify, claiming their privilege against self-incrimination. David Bradley claims that all proceeds belong to him because he owned the cattle on the Debtors' farm. Comerica Bank–Detroit, the Bank herein, argues that based on their properly perfected security interest in the cattle, they are entitled to the proceeds.

Since approximately 1969, the Debtors operated a farm at which they fattened hogs and cattle and then sold them for slaughter. Originally, the Debtors fattened livestock which they personally owned. At some point in the early 1980's the Debtors apparently had a cash flow problem and started to bring some cattle into their feedlots[1] in which they did not have an ownership interest. Those cattle were furnished by David Bradley, a man the Debtor met while buying cattle out of the South. Bradley agreed to deliver cattle to the Zwagerman farm in order for the cattle to be fattened. The first delivery to the Debtors was on or about November 27, 1981. Both the number of head per shipment and the number of shipments per month were sporadic. Each shipment was accompanied by a contract, generally including the following pertinent provisions:

1. That Red River will deliver a specified number of cattle on a specified date, with the expense of hauling to be paid by Red River.

2. Zwagerman agrees to feed such cattle and to be paid fifty-five (55) cents per pound for the poundage the cattle gain after being delivered.

3. Any loss of cattle by death shall be borne by Zwagerman.

4. Zwagerman agrees to feed the cattle until the weights reach approximately one thousand one hundred (1,100) pounds and when sold, the proceeds will be delivered to Red River. Red River will send to Zwagerman its check for the number of pounds gained by the cattle from time of delivery to Zwagerman to time of sale.

---

1. A "feed lot" is an area where the operator keeps his cattle while fattening them. A "custom feed lot" physically appears the same, but the operator does not own the cattle.

5. The parties agree that should any dispute arise in this agreement that the forum for settling such dispute will be Sumner County, Tennessee.

When the Red River cattle were received, they were not separated from the other cattle on the farm. The cattle were not branded, ear tagged, or identifiable in any such manner. Testimony produced at trial suggested that it is not the practice of farmers to so mark feeder cattle. Mr. Bradley stated that he knew that the Debtors originally had some of their own cattle on the farm, but thought that after shipping cattle for some time, his cattle were the only cattle on the farm. It appears, however, that Zwagerman purchased cattle intermittently from various parties, including 500 purchased from Bradley in April, 1983.

Each shipment from Bradley was composed of cattle of varying weights. Upon delivery to the farm, the Bradley cattle would be sorted and put into pens with animals of similar weight since cattle fatten best when they are in equally fat company.

Bradley never visited the farm, but called the Debtor two to six times a week to discuss the best time to sell based on the market and cattle conditions. Although no amount of time was set for the fattening of the cattle, Bradley estimated that it took 90–140 days. The purchasers made checks out to the Debtor who then deposited the check into one of his personal checking accounts. Pursuant to the contract, the Debtor was supposed to send a check to Bradley for the full amount of the sale.[2] Once Bradley received a check for the sale of cattle, he would send a weight gain check in return to the Debtor. Because the animals which were sold could not be identified with a particular contract, the number sold were credited against the oldest contract with an outstanding balance, a first in, first out (F.I.F.O.) method of accounting.

In the spring of 1983, the Debtor contacted Phillip Roberts, an agricultural loan officer at Comerica Bank, to pursue the refinancing of his debt to P.C.A. and F.M.B. The cattle on the farm were to be part of the security for the Comerica loan, just as they were for the existing P.C.A. loan. In deciding to recommend to the loan committee that a revolving credit loan for $1,300,000.00 and a term loan for $200,000.00 be given to the Debtor, Roberts testified that he took many things into consideration. He went out to the farm and saw cattle which the Debtor referred to as "my cattle." Parties mentioned on the various documents were contacted for verification, including Michigan Livestock Exchange which informed the Bank that Zwagerman bought cattle through them. Lien searches were done at the Register of Deeds. Various financial records, including bank statements and tax returns, were reviewed. A balance sheet paralleling statements dated 12/31/82 and 3/31/83, accompanied by an earnings work sheet, was submitted by the Debtor. Production of the Bills of Sale for the cattle was not required since Comerica was refinancing a debt owed to P.C.A.

The balance sheet bearing dates of 12/31/82 and 3/31/83 indicated in the assets section an increase of 715 cattle in three months and a decrease in liabilities. Roberts commented that it is typical for banks to have problems interpreting the figures submitted by farmers, particularly those who do a large amount of buying and selling, as farmers are usually poor bookkeepers. Therefore, it was left up to an analyst to reconcile the figures. The accompanying earnings work sheet showed "custom cattle" as an entry separate from "cattle" in the amount of $208,232.00 for the period ending 3/31/83. Roberts admitted that in 1983 he knew the term "custom cattle" meant that the farmer didn't own the cattle, but rather would be compensated for feed and care of the cattle pursuant to an agreement with the owner. Furthermore, he stated that he would have red flagged any documents with such an entry to require more information regarding ownership. The only explanation Roberts

---

**2.** In some of the contracts, it was agreed that the amount paid by the debtor to Bradley would be the amount of the sale minus two percent of the total to allow for "shrink."

proffered to the Court was that when the loan application was being reviewed in 1983, no one from the Bank, including himself, caught the entry.

On November 10, 1983, a note and security agreement were signed. The security agreement purportedly gave the Bank a security interest in the livestock. The following paragraph was also contained within that document,

2.4 At the time any Collateral becomes subject to a security interest in favor of Bank, Debtor shall be deemed to have warranted that (i) Debtor is the lawful owner of such Collateral and has the right and authority to subject the same to a security interest in Bank ...

A financing statement was filed by the Bank on November 17, 1983.

According to a 11/12/84 annual review by the Bank of the Zwagerman loan, the loan was in default for a variety of reasons and there was noted concern regarding Gordon Zwagerman's speculation in the commodity markets. Nevertheless, the loan commitments were renewed and an additional $80,000.00 was provided to fund a hedge account.

No comprehensive records for any year between 1981 and 1986 were available to the Court to show how and from where all cattle on the Debtors' farm had been obtained. As for 1985, the evidence offered at trial identified three known sources of cattle other than Bradley. Michigan Livestock Exchange sold to the Debtors nine cattle on an unspecified date in 1985. On April 23, 1985, the Debtors purchased 55 head from Barber. On April 24, 1985, the Debtors bought 56 head from Iowa Livestock. Barber made another cattle sale to the Debtors on October 1, 1985, of 110 head. Prior to April 23, 1985, Bradley had shipped to the Debtors over 6,500 cattle, and from April 25, 1985, through the last shipment on November 18, 1985, 1,704 more were delivered.

On December 3, 1985, Bradley received a call from Gordon Zwagerman who disclosed that many Bradley cattle had been sold without accounting for them to Bradley. The last payment Bradley had received for cattle sales was on November 25, 1985, and had been written off by Bradley and Zwagerman against shipment contracts dated 9/21/84 and 10/5/84 pursuant to their F.I.F.O. accounting practice. The 90–140 day turnaround period had become a 13–14 month turnaround period. No cattle were shipped and no checks were sent or received by Bradley after that December 3, 1985, telephone call. A few days later, the Zwagermans' attorney told Bradley that approximately 458 cattle were on the farm. In contrast, Bradley's records showed that 3,141 cattle should have been on the farm.

On December 11, 1985, Comerica was contacted by the Zwagermans' attorney who relayed that the Zwagermans had encountered financial difficulties due to losses in the commodity futures market, the number of cattle presently on the farm was much lower than the Bank records reflected, and a David Bradley owned at least some of the cattle. Two days later the Bank "took possession" of the cattle, but actually left them on the farm and paid Gordon Zwagerman $500.00 a week to take care of them.

The Debtors' former attorney testified, based on his notes, that between December 6, 1985, and January 7, 1986, 119 cattle were sold and that he deposited the proceeds into a designated account. Those proceeds were later turned over to the Trustee. A remaining balance of 325 head were eventually sold by the Trustee after the Debtors filed bankruptcy. The Trustee now holds cattle proceeds totaling over $288,000.00 in an interest bearing account.

The parties submitted a stipulation which included the following:

1. This Court has jurisdiction over this case.

2. This adversary proceeding constitutes a "core proceeding."

3. The Debtors made a total of $261,-882.84 in payments to Bradley by checks dated between September 30, 1985, and November 25, 1985. The parties disagree as to whether the first check for $43,198.40, dated September 30, 1985, and deposited by Bradley on October 2,

1985, falls within the ninety day preference period.

4. Each check sent by the Zwagermans to Bradley during the preference period was covered by sufficient funds that were attributable to cattle sales and deposited into a Zwagerman checking account, which account also contained funds from sources other than the sale of cattle. However, the parties do not agree as to the source of the cattle or that Bradley was the owner of the cattle.

5. The Debtors were insolvent within the 90 days before bankruptcy.

6. David Bradley did not file any financing statement with respect to the livestock or proceeds at issue in this adversary proceeding.

7. The document attached to the stipulation as Exhibit B is an accurate record of cattle sales made by the Debtors between August 1, 1985, and December 2, 1985.[3]

8. In the event Gordon and Joan Zwagerman refuse to give testimony material to this adversary proceeding based upon their asserted Fifth Amendment right, the parties waive all hearsay objections with respect to evidence of statements made by Gordon and/or Joan Zwagerman, provided, however, that the parties waive only the right to challenge admissability, and reserve all other rights to object to relevancy, credibility and weight.

In accordance with the stipulation to waive hearsay objections to statements of the Debtors, paragraph eight as numbered above, a transcript of the 341 Meeting was submitted into evidence. The following portions of the transcript are statements made in regard to the identity of cattle on the farm in 1985.

Question: And how many other cows would have been on the farm from people other than Mr. Bradley during the period of October 1, through December 30?

Debtors' Attorney: If you can't answer, you can't answer.

Answer: I don't know.

Question: Would these simply be Mr. Barber's cows?

Answer: They would be the only ones, but I'd have to check the dates.

. . . .

Question: You bought some cattle from Mr. Barber?

Answer: Right.

Question: About 110, correct?

Answer: Right.

Question: Early part of October?

Answer: Right.

In further explanation of the Debtors' October, 1985, purchase of cattle from Barber, Bradley relayed to the Court a telephone conversation he and Gordon Zwagerman had after the second day of this trial. Bradley testified that the Debtor disclosed to him that, "Your money paid for the cattle." The Zwagermans tendered $52,-000.00–53,000.00 for those 110 Barber cattle.

Two purchasers of Zwagerman's finished cattle were called at trial. The first was Ronald Vanderboon who, on behalf of Ada Beef, had been buying cattle from the Debtors for 18 years. Vanderboon testified that he never had the impression that the Debtors were operating a custom feed lot, but rather, believed that Gordon Zwagerman was indicating that he owned the cattle when he called Ada Beef and said, "I have a load of cattle to sell." Usually, purchases from the Debtors were made over the telephone because Vanderboon was familiar with the type of cattle they were feeding. Vanderboon visited the farm only about once a year. Awareness of custom feed lot arrangements was important to Ada Beef in order to ensure payment to the proper party. A new customer of Ada Beef would have been questioned as to ownership.

The second purchaser, who both bought from and sold to the Debtor, was Gary

---

**3.** Between October 1, 1985, and December 2, 1985, 561 cattle were sold for a total of $365,-022.58.

Walters on behalf of Michigan Livestock. He had met and started doing business with Gordon Zwagerman in 1982. For various reasons, Walters always believed the Debtor owned the cattle on his farm. Michigan Livestock sold to the Debtor 1,400 cattle in 1983, 400 in 1984, and 9 in 1985. Therefore, they knew first hand he was buying cattle. Walters was on the farm every 2–3 weeks to look at prospective purchases of cattle. While there, he would inquire as to the price paid for cattle which were apparently sold to the Debtor by Michigan Livestock's competitors. Gordon Zwagerman told Walters the amount the various vendors, including Bradley, had charged him. When the Debtor was ready to sell, he called Walters and stated, "I have got a load of cattle to sell." No indication was ever given to Walters by the Debtor which would have suggested that the Debtors were custom feeding.

Ronald Dingerson, qualified at trial as an expert as to the practice and custom of the livestock feeding industry, testified that in Michigan there were few, if any, custom feeders in the early 1980's, the number of such arrangements peaked in 1986, and it was uncommon in 1989. Michigan Livestock, the only other owner of custom fed cattle to be identified at trial, was described by Dingerson as "the primary people involved with custom feeding in this state." Their program began, as described herein, in 1986. Special ear tags, a minimum of once a month inspections, filing of financing statements, and sale through Michigan Livestock are used to monitor the cattle. Prior to Michigan Livestock's program, Dingerson was not aware of anyone with an interest in custom fed cattle who filed a financing statement. However, since the start of that program, other similarly situated parties have filed.

## JURISDICTION

The parties have stipulated that this court has full jurisdiction to try and decide this adversary proceeding.

## DISCUSSION

Bradley contends that because he retained ownership in the cattle and the rela-tionship between himself and the Debtor was only a bailment, the proceeds are held for his benefit by constructive trust. Comerica claims that the Bradley/Debtor relationship was not a bailment, but rather a consignment subject to Mich.Comp.Laws § 440.2326 (1989) (Mich.Stat.Ann. § 19.2326 (Callaghan 1990)), and therefore their properly perfected security interest gives them an interest in the proceeds which has priority over Bradley. The Trustee argues that the nature of Bradley's interest is either a consignment subject to Mich.Comp.Laws § 440.2326 (1989) (Mich.Stat.Ann. § 19.2326 (Callaghan 1990)) or a security interest, and not a bailment. Thus, the Trustee asserts that Comerica has a superior interest in the proceeds, or in the alternative, based on his status as hypothetical lien creditor under 11 U.S.C. § 544, the proceeds are property of the estate; and all the payments the Debtors made to Bradley for cattle sales within ninety days of the bankruptcy are preferences.

Although Count I of the Complaint suggested that the contract between Zwagerman and Bradley created a security interest under Article 9 of the U.C.C., I assume that such a claim has been abandoned since there were no arguments at trial advancing that position. In addition, the evidence does not indicate that there was any intent between the contracting parties that Bradley would retain a security interest in the cattle.

### Bailment

Where personal property is found in the hands of the debtor it is frequently necessary to determine whether the property is so held by virtue of an absolute or conditional sale to the debtor, or whether it is held through some relationship whereby the goods actually belong, save for the debtor's right to possession, completely to another, such as a bailment, agency, or consignment. This is important, of course, from the standpoint of determining what interests in the property will comprise property of the estate. It may also be important from the stand-

point of the trustee's powers under sections 544, 547, and 548.

A bailment is nothing more than a delivery of goods for some purpose, upon a contract, express or implied, to be redelivered to the bailor upon fulfillment of the purpose or to be dealt with according to the bailor's direction. Similarly, an agency is a relationship arising from a contract, express or implied, by which one of the parties confides to the other the transaction or management of some business or other activity in his name, or on his behalf, and whereby the other party assumes so to act and to render an account thereof. Thus in both situations, the title to the property remains in the bailor or principal, and the bailee or the agent holds the property under the bailment or agency for the owners' benefit. Consequently, it became well settled under the Bankruptcy Act that absent state statutory enactment to the contrary, if property was in a debtor's hands as bailee or agent, the trustee held it as such, and the bailor or principal could recover the property or its proceeds.

4 Collier on Bankruptcy § 541.08[2] (15th ed.1990). Bradley has suggested in his briefs that Zwagerman was an agister and the contract was an agistment. The term agistment is an ancient one derived from the old Germanic word *giest* meaning guest. The Random House Dictionary of the English Language (1973) indicates agistment as being an obsolete word meaning the act of feeding or pasturing for a fee. Black's Law Dictionary 61 (5th ed.1979) defines agistment as:

> Agistment. A contract whereby a person, called an agister, has control of animals and retains possession of land. *Cox v. Pithoud*, 221 C.A.2d 571, 34 Cal.Rptr. 582, 583. The taking in and feeding or pasturing of horses, cattle, or similar ani-

mals for a reward and is a species of bailment. *Marcus v. Eastern Agr. Ass'n, Inc.*, 58 N.J.Super. 584, 157 A.2d 3, 8.

Delivery of animals pursuant to a contract of agistment has been held to be a bailment of the animals. *Lepel v. Hitch*, 468 F.2d 149, 151 (10th Cir.1972).

"Bailment," in its ordinary legal signification, imports the delivery of personal property by one person to another in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed and the property returned or duly accounted for when the special purpose is accomplished. *In re George L Nadell & Co, Inc*, 294 Mich 150, 154; 292 NW 684 (1940); *National Ben Franklin Ins Co v. Bakhaus Contractors, Inc*, 124 Mich App 510, 512, n 2; 335 NW2d 70 (1983).

*Goldman v. Phantom Freight*, 162 Mich. App. 472, 413 N.W.2d 433 (1987), *leave to appeal denied*, 429 Mich. 867 (1987). *See also Sturm v. Boker*, 150 U.S. 312, 14 S.Ct. 99, 37 L.Ed. 1093 (1893).

The contracts and the practice of the parties seem to clearly indicate their intent. Bradley had cattle to be fed. Zwagerman had good feed. Not only was Michigan grass superior to Tennessee grass but also Zwagerman had access to good silage and even discarded cookies. Bradley delivered the cattle to Zwagerman who fed them until they reached a certain weight. Then, by mutual agreement they were sold at an agreed price. Zwagerman, as a bailee or agister, never had title to the cattle. *See id.*

### Effect of U.C.C. § 2-326 [4]

■ The Bank and Trustee claim that because of Bradley's failure to give notice

---

**4.** Legal writers have had a field day with U.C.C. § 2–326. For instance, Hillinger, *The Treatment of Consignments in Bankruptcy: Two Codes and Their Fictions, at Play, in the Fields*, 6 Bankr.Dev.J. 73 (1989), commences with this comment:

> Once upon a time, a long time ago (and certainly before there was a Commercial Code), the legal treatment of the "true" con-

signment matched the parties' expectations. The parties viewed it as a bailment and the law treated it as such. The story of consignments was a simple one, whether it was told in or out of bankruptcy.

Today, the legal story is far more complex and interesting. It involves subplots, legal fictions and surprise twists. It can baffle persons not fully acquainted with the mysteries

under Uniform Commercial Code (U.C.C.) § 2–326, his interest is subordinate to theirs. The written contracts seem to imply that Tennessee law will apply. However, both Tennessee and Michigan have adopted the U.C.C. and I find no material differences between Tenn.Code Ann. § 47–2–326 (1989) and Mich.Comp.Laws § 440.2326 (1989) (Mich.Stat.Ann. § 19.2326 (Callaghan 1990)). (All subsequent references will be to the U.C.C.)

U.C.C. § 2–326 provides:

Sale on Approval and Sale or Return; Consignment Sales and Rights of Creditors.

(1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is

(a) a "sale on approval" if the goods are delivered primarily for use, and

(b) a "sale or return" if the goods are delivered primarily for resale.

(2) Except as provided in subsection (3), goods held on approval are not subject to the claims of the buyer's creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer's possession.

(3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum". However, this subsection is not applicable if the person making delivery

(a) complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign, or

(b) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or

(c) complies with the filing provision of the Article on Secured Transactions (Article 9).

. . . .

Section 2–326(1) is limited to transactions where delivered goods may be returned by the buyer even though they conform to the contract. There was never any intent that Zwagerman could return the cattle to Bradley. Costs, together with the shrinkage loss, would have made a return economically unfeasible.

■ In this case, delivery was never made to a buyer. U.C.C. § 2–103(1)(a) provides: "(1) In this article unless the context otherwise requires (a) 'Buyer' means a person who buys or contracts to buy goods." The U.C.C. does not seem to define "buy." Black's Law Dictionary 181 (5th ed. 1979) defines "buy" as "[t]o acquire the ownership of property by giving an accepted price or consideration therefor; or by agreeing to do so; to acquire by the payment of a price or value; to purchase."

There was no agreement between Bradley and Zwagerman that Zwagerman would acquire ownership in the cattle. No price was agreed upon. Sale was not to take place until sometime in the future at which time Zwagerman would sell as agent for Bradley, at a price agreeable to Bradley, and the entire proceeds of the sale would be sent to Bradley less a shrinkage fee.

■ Section 2–326(1)(b) would restrict the operation of § 2–326 "Sale or return" transactions to those instances where the goods were delivered "primarily" for re-

of both the Uniform Commercial Code (hereinafter, "U.C.C.") and the Bankruptcy Reform Act of 1978 (hereinafter "Bankruptcy Code"). It can confuse even those who are.

At p. 119, Professor Hillinger in referring to *In re State St. Auto Sales, Inc.,* 81 B.R. 215 (Bankr. D.Mass.1988), states:

A court recently remarked, "[t]he Uniform Commercial Code's provisions regarding consignments are not models of draftmanship." [Author's note: This court's observation gives new meaning to the word "understatement."] When courts are forced to apply a confusing state law scheme to determine federal bankruptcy rights, confusion inevitably occurs.

sale. The word "primarily" is not defined in the U.C.C. XII The Oxford English Dictionary 472 (2d ed. 1989) defines "primarily" as "[w]ith reference to other temporal order: In the first place, first of all, pre-eminently, chiefly, principally; essentially."

In this case I find that delivery was not primarily for resale. The cattle were shipped for feeding and fattening. If it were primarily for resale, it would have been much more reasonable to sell them in Tennessee and avoid the expense of transporting, shrinkage, and other loss unless an unusual market condition existed in the Southwestern Michigan area; and there were no proofs to that effect.

Thus, for all the reasons states, the court finds that this case does not involve a "sale or return" under § 2–326(1).

This brings us to § 2–326(3). Undisputedly, the exclusions found in sections 2–326(3)(a), (b), and (c) do not affect this case. No applicable sign law exists, the Debtors were not known by their creditors to be engaged in selling the goods of others, and Bradley stipulated that he did not file a financing statement[5]. Therefore, a determination must be made as to whether or not the facts of this case fall within the parameters of U.C.C. § 2–326(3).

The court finds that the goods were not delivered to Zwagerman "for sale." It is not clear whether "for sale" refers to the sale to the buyer or resale by the buyer to third parties. But, delivery was not "for sale" in either event. As stated above, the delivery was for the care, feeding, and fattening the cattle. It would have been far more economical for Bradley to sell or to have someone in Tennessee sell the cattle and save shipping and shrinkage costs.

There is a closer question as to whether Zwagerman maintained a place of business at which he dealt in cattle. He was a farmer, who for many years raised his own cattle and custom fed the cattle of others. Eventually, he sold the cattle delivered to him by Bradley, as Bradley's agent, at a time, place, and price controlled by Bradley. There were no proofs that sales took place at the farm, even though this would have been possible.

I do not find a definition of consignment in the code. A "consignment contract" is defined in Black's Law Dictionary 278 (5th ed. 1979) as "[c]onsignment of goods to another (consignee) for sale under agreement that consignee will pay consignor for any sold goods and will return any unsold goods." A consignment contract, as defined above, is common. This type of consignment has not given courts a lot of trouble, and is the subject of many of the cases cited to by the Trustee and the Bank. I have read and agree with the conclusion of those cases.[6]

*BFC Chemicals, Inc., v. Smith–Douglass, Inc.*, 46 B.R. 1009 (E.D.N.C.1985) is slightly different from the cases noted above. A certain chemical was placed by BFC, the creditor, in a large storage tank from which the debtor withdrew its needs

---

5. Due to the stipulated fact that Bradley did not file a financing statement, I do not need to expound upon the perfection requirements for consignments found in U.C.C. § 9–114.

6. *In re Bro Cliff, Inc.,* 8 U.C.C.Rep.Serv. (Callaghan) 703 (W.D.Mich.1971); *In re Bro Cliff, Inc.,* 8 U.C.C.Rep.Serv. (Callaghan) 242 (W.D.Mich. 1970); *Quaker City Iron Works, Inc. v. Ganz (In re Wicaco Machine Corp.),* 49 B.R. 340 (E.D.Pa. 1984), *aff'd,* 770 F.2d 1074 (3d Cir.1985); *W.N. Provenzano, Inc. v. Monahan & Co.,* 36 U.C.C. Rep.Serv. (Callaghan) 1601 (D.Mass.1983); *In re Gross Mfg. & Importing Co., Inc.,* 328 F.Supp. 905 (D.N.J.1971); *Scott v. Almiro Fur Fashion Design (In re Fisher),* 100 B.R. 351 (Bankr.S.D. Ohio 1989), *modified,* 101 B.R. 507 (Bankr.S.D. Ohio 1989); *Multibank National of Western Massachusetts v. State Street Auto Sales, Inc. (In re State Street Auto Sales, Inc.),* 81 B.R. 215 (Bankr.D.Mass.1988); *Makoroff v. Butler Tire Center (In re Castle Tire Center, Inc.),* 56 B.R. 180 (Bankr.W.D.Pa.1986); *First Interstate Bank of California v. Great American Veal, Inc. (In re Great American Veal, Inc.),* 59 B.R. 27 (Bankr.D. N.J.1985); *Leverett Co. v. Arthur A. Everts Co. (In re Arthur A. Everts Co.),* 35 B.R. 706 (Bankr. N.D.Tex.1984); *Loeb v. G.A. Gertmenian & Sons (In re A.J. Nichols, Ltd.),* 21 B.R. 612 (Bankr.N. D.Ga.1982); *Harker v. Dauphin Deposit Bank and Trust Co. (In re E.G. Hoover Co., Inc.),* 16 B.R. 435 (Bankr.M.D.Pa.1982); *Georgia–Pacific Corp. v. Walter E. Heller & Co. Southeast, Inc.,* 440 So.2d 666 (Fla.Dist.Ct.App.1983); *Columbia International Corp. v. Kempler,* 46 Wis.2d 550, 175 N.W.2d 465 (Wis.1970); *Helm's Jewelry & Gift Shop, Inc. v. Hollis,* App. No. 85–78–II, 1985 WL 4569 (Tenn.Ct.App. Dec. 18, 1985).

from time to time to formulate agricultural chemicals for resale to its customers. The debtor then paid BFC for chemical taken. The debtor filed under Chapter 11. BFC filed what was treated by the bankruptcy judge as a motion for relief from stay. This was denied. The district judge held that N.C.G.S. § 25-2-326 was applicable because the goods were delivered "for sale" and the matter was remanded for reconsideration and a determination whether BFC complied with N.C.G.S. § 25-2-326(3)(a). While this is somewhat different than the above cited consignment cases, I believe I would be inclined to agree with the district judge.

In *Simmons First National Bank v. Wells*, 279 Ark. 204, 650 S.W.2d 236 (1983), the bank had a perfected security interest in inventory and after acquired property of Western Rice Mills. Western defaulted on its loan and a receiver was appointed. Wells intervened. Until about four months prior to the receivership, Wells sold his rice to Western which milled and resold it. But, because of Western's financial inability to buy the rice outright, Wells had orally agreed that Western would mill for a certain price, market at an agreed price, and turn over the proceeds less Western's charge for milling. The trial court held for Wells. The state supreme court held that here was a clear consignment but remanded to determine whether Wells was protected by the state statute pertaining to grain warehousemen. This case differs from our case in that Western marketed the rice at an agreed minimum price. It could be said that in the Wells case delivery was primarily for resale.

*O'Brien v. Chandler*, 765 P.2d 1165 (N.M.1988) involved an oral agreement between McCoy, a cattle dealer, and Chandler, a cattle broker, whereby McCoy agreed to ship cattle to a feedlot for delivery to Chandler. Delivery was made and McCoy furnished invoices to Chandler which set out the sales price. Without knowledge to McCoy, Chandler obtained a loan from a bank and pledged the cattle as security. This security interest was perfected. The bank claimed that it had no knowledge of any interest of McCoy.

McCoy sued to recover the cattle. The trial court held that the bank had a perfected security interest superior to any rights of McCoy. The New Mexico Supreme Court affirmed, holding that the contract was a sale. This case differs from ours in two important facts. First, a price was set, and secondly, invoices were furnished. If the bank had requested proof of ownership, Chandler had the proof in the invoices. In our case, if any creditor had requested proof of ownership, all Zwagerman could have furnished would have been contracts that indicated that he had no interest in the cattle.

In *In re Shamrock Coal Co., Inc.*, 47 B.R. 867 (Bankr.E.D.Pa.1985), certain equipment was installed in the debtor's plant on a trial basis. No filing gave notice of the owners' interest. However, on a motion for relief from stay, the court held the equipment was not property of the estate and the court had no jurisdiction to prevent movants from exercising any non-bankruptcy rights or remedies it might have in the equipment.

In *Eastman Kodak Co. v. Harrison (In re Sitkin Smelting & Refining, Inc.*, 639 F.2d 1213 (5th Cir.1981), *reh'g en banc denied*, 645 F.2d 72 (1981), Sitkin entered into an agreement with Eastman by which it would process film waste and purchase the silver content recovered. Sitkin filed under Chapter XI. Eastman filed an adversary proceeding against the trustee in bankruptcy and C.I.T. Corp., a secured creditor. The bankruptcy referee held that possession should be entrusted to the C.I.T. The court of appeals reversed, concluding that the agreement between Kodak and Sitkin provided for a bailment of the unprocessed waste, and therefore, Kodak was entitled to reclaim possession. The court stated:

> The transaction between Kodak and Sitkin is not a sale or return within the meaning of section 2-326, since the goods were not delivered for resale with an option to return. C.I.T., then, fails to overcome the presumption against the application of section 2-326.

*Id.* at 1218. I would agree with the result reached in *Sitkin* but not on the basis for the decision. Even if this was a "sale or return," the print waste was not "delivered primarily for resale."

In *Union State Bank of Hazen v. Cook (In re Cook),* 63 B.R. 789 (Bankr.D.N.D. 1986), parents, a son and his wife, and a partnership of which the father and son were partners filed petitions under Chapter 11. These debtors operated a family farm on which they raised Angus cattle and maintained a custom feed lot. Another son, Tom, did not stay on the farm but cattle he had raised as part of a 4-H project were left on the farm. He spent about one week each year on the farm. The court found that the business relationship between Tom and the debtors was quite loose. Tom's cattle were not separated from the debtors' cattle. The debtors were allowed to cull and market Tom's cattle, and even retain some of the proceeds of his cattle, but he never gave them authority to mortgage his cattle. The plaintiff bank was granted a security interest by the debtors in all livestock owned by them, including the increase thereof. The bank was not aware of Tom's interest until the bankruptcy was filed. Partnership schedules indicated 36 head were held for Tom, valued at approximately $22,000.00. While there were other issues before the court in determining ownership, the court noted that the cattle were all branded with the partnership brand. Although North Dakota has a branding statute, a brand is only prima facie evidence of ownership. N.D.Cent.Code § 36–09–19 (1980). The testimony of Tom and his brother was found to be convincing and supported by the fact that some of the cattle were registered by the American Angus Association in Tom's name. The court held that the parties' intent was crucial, and the intent was that Tom retain ownership. The burden was on the bank to demonstrate that the debtors possessed sufficient rights in Tom's cattle for the security interest to attach. The debtors' authority to sell Tom's cattle did not give them the authority to encumber the cattle.

In *Cook,* as in our case, the bank was casual about its loan. Although the bank representative made inspections of the operation, he never counted the cattle. The bank's officer admitted that other cattle besides debtors' could have been on the ranch and that he relied only on the financial statements submitted. The court held that Tom's cattle were not subject to the bank's lien.

In *First National Bank of Blooming Prairie v. Olsen,* 403 N.W.2d 661 (Minn.Ct. App.1987), Olsen owned and operated a feedlot for which the bank provided financing. The bank had a perfected security interest in Olsen's farm property including livestock. There were approximately 2,500 cattle on the farm, all of which were owned by third-party investors. The owner-investors did not perfect under § 2–326. The bank filed a replevin action and the trial court held that § 2–326 did not apply because the cattle were not delivered for sale. The court of appeals held that the § 2–326 did apply, relying on the official comment that "[S]ubsection (3) resolves all reasonable doubts as to the nature of the transaction in favor of the general creditors of the buyer." However, the court found for the investors because the bank had actual knowledge that Olsen custom-fed a substantial number of cattle.

*First National Bank of Blooming Prairie* referenced *Manufacturers Acceptance Corp. v. Penning's Sales, Inc.,* 5 Wash. App. 501, 487 P.2d 1053 (Wash.Ct.App. 1971). There the plaintiff, Manufacturers, had been financing Penning's, a retail paint store, since the early 1960's. When the U.C.C. went into effect on July 1, 1967, a security agreement and financing statement were executed but the financing statement was not filed at that time. On February 9, 1968, Penning's entered into an agreement with a new supplier which permitted the supplier to ship to itself at the store's address and to keep the paint in the back. At the supplier's direction, the store shipped to other dealers or the store purchased from the stored stock, moving the goods it purchased to the front of the store. Their security agreement and financing statement were executed on April

4, 1968. The financing statement was filed the same day. Manufacturers filed its financing statement April 12, 1968. Although the supplier perfected first, the trial court held that Manufacturers had a superior interest. The court of appeals affirmed on the basis that since Penning's purchase money security interest was not perfected at the time the sale took place, it was not perfected for the purpose of determining priority. This is a rather strange result, as a "sale or return" is not a real sale. However, that issue is not before this court.

In another cattle case, *Rohweder v. Aberdeen Production Credit Association*, 765 F.2d 109 (8th Cir.1985), Rohweder turned over certain cows to Bellman with an option to purchase for an agreed price. Bellman bred the cows with his bulls, calved them out, pastured, and cared for all of the cows and calves. Bellman was to receive 40% of calf crop and Rohweder was to retain the rest. The Rohweder cattle were pastured with Bellman's. Bellman branded some of the cows with his brand and ear tagged the calves. Rohweder instructed Bellman to sell off some of the older and poorer cows. Some sale barns paid Bellman, who then paid Rohweder, and others paid Rohweder directly. Bellman had given PCA a security interest in all of his cattle and after acquired cattle. Bellman then filed under Chapter 11. PCA seized all of the cattle, resulting in Rohweder suing PCA for conversion. The district court ruled that Bellman had sufficient rights for attachment of a security interest and granted a directed verdict at the close of plaintiff's proofs. The court of appeals dismissed the judgment and remanded the proceedings for trial by jury. The court stated:

> Unlike *Morton Booth* [*Co. v. Tiara Furniture, Inc.,* 564 P.2d 210 (Okla. 1977) ] and *Kinetics* [*Technology Intern. Corp. v. Forth National Bank,* 705 F.2d 396 (10th Cir.1983) ], taking the evidence in this case most favorable to Rohweder, the transaction can be found to be a true bailment in which Bellman's interest is that of a bailee. We are aware of no cases in which the interest of a genuine bailee was sufficient to support the attachment of a security interest and PCA has cited none. On the contrary, the cases have concluded that the security interest of a bailee's creditor does not attach to goods which are the subject of a bailment. *In re Sitkin Smelting & Refining, Inc.,* 639 F.2d 1213, 1216 (5th Cir.1981); *Chrysler Corp. v. Adamatic, Inc.,* 59 Wis.2d 219, 208 N.W.2d 97, 104–05 (1973). Furthermore, mere possession of the collateral or an unexercised option to purchase does not give the debtor sufficient rights for a security interest to attach. *Pontchartrain State Bank v. Poulson,* 684 F.2d 704, 707 (10th Cir. 1982); *see* 4 R. Anderson, *Anderson on the Uniform Commercial Code,* § 9–204:7, at 179 (2d ed. 1971). Accordingly, we hold that the district court erred in concluding as matter of law that Bellman had sufficient rights in Rohweder's cattle for the PCA's security interest to attach.

> . . . .

> We conclude that the directed verdict must be set aside, and we reverse the judgment of the district court. At trial, the burden is on Rohweder to show that he actually owned the cattle in question. Evidence that the cattle bore Rohweder's brand, or evidence of the Genre brand plus a bill of sale from Genre to Rohweder, would constitute prima facie proof of ownership. Once Rohweder makes his prima facie showing, the burden shifts to the PCA to demonstrate that Bellman possessed sufficient rights in the cattle for its security interest to attach. The crucial question in this regard is the parties' intent. If Rohweder intended to make a conditional sale when he delivered the cows to Bellman, he retained only a security interest and Bellman had sufficient rights for PCA's security interest to attach. On the other hand, if the parties intended to create a bailment, with Rohweder retaining complete ownership of the cows and relinquishing only possession, Bellman would not have sufficient rights for attachment of PCA's lien and, in the absence of an estoppel,

Rohweder should prevail. While the factors of control over the cattle, including the right of sale, and the option to purchase do not necessarily constitute "rights in collateral," they are relevant evidence for the jury in determining the parties' intent to transfer an ownership interest to Bellman.

*Id.* at 112–113.

In *Walter E. Heller & Co. S.E. v. Riviana Foods, Inc.*, 648 F.2d 1059 (5th Cir. 1981)[7] Riviana entered into a warehouse agreement with Amos Brokerage Company to store and eventually deliver the goods to Riviana's customers. Amos was not permitted to sell these goods but did maintain a place where it sold like goods under another name. Heller and Amos entered into an inventory security agreement and accounts financing security agreement. Subsequently, Amos filed bankruptcy. The court held that the goods were not delivered "for sale" as required by U.C.C. § 2–326 for a "sale and return." It drew a comparison to *Allgeier v. Campisi*, 117 Ga.App. 105, 159 S.E.2d 458 (1968), where the plaintiff entrusted her car to a dealer who was authorized to receive offers but lacked authority to sell without the approval of the plaintiff. The defendant, a security interest holder in the plaintiff dealer's inventory, sought possession of the car. The court held for the plaintiff since the car was not delivered "for sale" under U.C.C. § 2–326.

As can be noted from the cases mentioned above, there has been little uniformity in the court decisions on § 2–326. There is much to be said for extension of the section to situations that were not anticipated or intended by the drafters of the law. If I could interpret the law as I think it should be written, I would probably hold that § 2–326 should be applied to every situation where there may be secret interests in property which would be harmful to those dealing with the person having possession. One of the purposes of Article 9 was to eliminate the secret lien, and an aim of § 2–326 was to protect third parties in consignment cases. However, cattle cases are not as serious as some of the situations faced by courts in the cases above. Any prudent, prospective lender or purchaser is well aware that cattle may be custom fed or cows may be leased. More disturbing are the inventory cases in which it is not common practice to deliver goods while retaining title.[8]

I am well aware of the provision in § 1–102 of the U.C.C. which provides that, "This Act shall be liberally construed and applied to promote its underlying purposes and policies." Nevertheless, radical changes in the unambiguous provisions of the law should not be made by judicial interpretation. The result would be to uproot the drafters' intent to promote uniformity and certainty. It is much better that such changes be brought about by legislation after much discussion both inside and outside the legislative bodies concerned. It was no accident that the Michi-

---

7. *First National Bank of Blooming Prairie* was critical of this case. *See supra* for discussion of that case p. 551.

8. In a recent opinion, *Agri–Tech Services, Inc. v. Citizens Bank of Clovis (In re Groff)*, 898 F.2d 1475 (10th Cir.1990), the bank took a security interest in cattle owned by the debtors and all cattle "after acquired." At the time, Lee Groff, one of the debtors, was about to enter into a cattle feeding venture with Ed Pickering. The Groffs then filed a petition in bankruptcy and the question arose as to the creditors' rights in the Groff–Pickering cattle. The bankruptcy court held that:

    a. Groff and Pickering were engaged in a joint venture.

    b. The cattle were the property of the joint venture.

    c. New Mexico partnership law applies to joint ventures.

    d. The bank had no interest in the Groff–Pickering cattle.

    e. The bankruptcy estate contained the debtors' interest in the joint venture as determined under New Mexico partnership law.

The District and Circuit Courts affirmed.

    Of course, our case does not involve a joint venture. Neither Joan nor Gordon Zwagerman had any interest in the cattle. However, this is one more example of how cattle can be on a debtor's farm without the debtor having any interest in them.

    Even as to real estate, recording statutes are not a full protection for creditors or even *bona fide* purchasers. *See Robbins v. Lenz (In re Perrin's Marine Sales, Inc.)*, 63 B.R. 4 (Bankr.W. D.Mich.1985).

gan U.C.C. Act of 1962, 1962 Mich.Pub. Acts 174, did not become effective until over a year later on January 1, 1964. Those of us who were around at that time can recall the many seminars which were held for lawyers, accountants, financial institutions, trade associations, and many others to prepare the commercial world for this new law. Because the U.C.C. was so superior to what it replaced it was not surprising that some lawyers and jurist expected a miraculously all-encompassing statute. However, the U.C.C. has been amended many times and I am sure it will be amended many more times in the future.

R. Anderson, Anderson on the Uniform Commercial Code § 1–102:20–21 (1981) states:

When a section of the code is clear and unambiguous there is "no occasion" to engage in statutory construction.

Contrary to the rule of liberal construction stated in the preceding sections, there is some authority that the Code is to be strictly construed where in derogation of the common law, and a statute should be construed in harmony with the common law unless there is a clear legislative intent to abrogate the common law. In many states there are special statutory construction acts that expressly repudiate this principle of statutory construction, so that it is extremely doubtful whether strict construction should be made solely because of conflict with the common law.

A better reason for strict construction is that if the court does not adhere to the letter of the Code, the objective of certainty will be defeated. Thus where the Code is unambiguous, it should be applied according to its letter, as to do otherwise would merely produce confusion in the business world.

When the provisions of the Code are unambiguous they are to be followed by the courts....

A court should adhere strictly to the provisions of the Code in order to achieve stability, consistency, and predictability. And an "overly" liberal interpretation of the Code should be avoided as creating uncertainty among businessmen and their legal advisors who believe themselves to be entering into transactions on the basis that the Code means what it says.

Loose construction of the Code cannot be justified on the basis of the direction to construe the Code liberally as a mandate for liberal construction is not a "license to legislate."

Later Anderson continues:

The certainty of commercial practices and relations is essential to furthering trade. Consequently as a variant of the objective of furthering trade, a court should so interpret the Code as to further certainty in commercial dealings.

*Id.* at § 1–102:46.

The dangers of expanding the boundaries of § 2–326 cannot be better illustrated than the case before us. Bradley, at the time of trial, was an 80 year old man who had been in the cattle business his entire life except for a few years in service during World War II. He had also served as a vice president of a local bank. While he was aware of the practice of custom feeding of cattle, he never actually engaged in it before his arrangement with the Debtors. He then did what any prudent businessman should do—he visited his lawyer who "was good," according to Bradley, because he subsequently became a judge. His lawyer set up a group of forms to be used and instructed Bradley as to the procedure to be followed, but he never instructed Bradley to perfect his transaction by filing with a register of deeds. Bradley had never heard of requiring the filing of a financing statement as to these transactions. Testimony during the trial indicated that there was little custom feeding going on in Michigan at the time Zwagerman and Bradley entered into their joint undertaking. In the fall of 1986, Michigan Livestock, a large cattle dealer, commenced delivering their cattle for feeding in an operation similar to

that of Bradley and Zwagerman. It is possible they may have heard of Bradley's operation and problems by this time. Before that, most of the custom lots were carried out by the big lots out West. Michigan Livestock filed a sort of financing statement; the form used did not comply with the U.C.C. but did give notice. However, testimony indicated that most persons delivering cattle for custom feeding did not file financing statements.

Twenty states have branding laws and dispose of title matters as to cattle through these laws. Neither Michigan or Tennessee have adopted such a statute.

From the clear terms of § 2–326, related sections of the U.C.C., the general commercial practice, and the fact that a number of states have felt that control in this area should be by a separate branding statute outside of the U.C.C., I find that the transaction with which we are concerned is not a "sale or return" under the meaning of § 2–326 and that the title to the cattle delivered to the Zwagermans by Bradley remained in Bradley.

### Tracing

In *Selby v. Ford Motor Co.*, 590 F.2d 642 (6th Cir.1979), Ford Motor Co., at the request of a contractor, paid 14 subcontractors directly while the contractor paid two others, all within the 4 month period before the contractor filed a petition under Chapter XI. The trustee brought an action against all of the subcontractors. The district judge declined to set aside the preferences on the basis that under Michigan Builders Trust Fund, the funds would have been held in trust for the subcontractors. The court of appeals affirmed, stating:

> Although the Bankruptcy Act does not deal expressly with trusts, the Supreme Court in an early case under the Bankruptcy Act of 1867 established that funds held in trust by a bankrupt debtor are immune from the claims of general creditors so long as the funds can be traced. *Hawkins v. Blake*, 108 U.S. 422, 435–36,

2 S.Ct. 804, 27 L.Ed. 775 (1882). This rule has not been changed by the current Bankruptcy Act, and the courts have continued to apply it. *See Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962); *First National Bank v. Staake*, 202 U.S. 141, 26 S.Ct. 580, 50 L.Ed. 967 (1905).

*Id.* at 645.

According to the proofs, at the time of filing the bankruptcy petition there were 3141 head of cattle belonging to Bradley that were not accounted for by Zwagerman.

From November 1981, until December 1985, Bradley shipped over 8204 cattle to Zwagerman under their agreements. Contracts on the first seven loads shipped, dated November 24, 1981, and March 30, 1982, did not indicate the number of cattle shipped. Excluding the uncounted loads, the number that were shipped per year is:

| Year | Number |
|------|--------|
| 1982 | 1082 |
| 1983 | 1346 |
| 1984 | 3956 |
| 1985 | 1820 |

During those same years, the only purchases by Zwagerman we can find a record of are:

| Year | Source | Number | Year Total |
|------|--------|--------|-----------|
| 1983 | Mich. Livestock | 1400 | |
| | Bradley | 500 | |
| | | | 1900 |
| 1984 | Mich. Livestock | 400 | |
| | | | 400 |
| 1985 | Mich. Livestock | 9 | |
| | Barber (4/23) | 56 | |
| | Iowa Livestock (4/24) | 56 | |
| | Barber—October | 110 | |
| | | | 231 |

■ The 110 cattle purchased in October, 1985, were purchased with funds obtained from the proceeds of sale of Bradley cattle. I would find that those cattle would be held by Zwagerman in constructive trust for Bradley.[9]

In *Missouri Pacific Railroad Co. v. Escanaba and Lake Superior Railroad Co.*,

---

9. Although this fact was evidenced by an out of court statement by Zwagerman, all of the parties agreed by stipulation that there would be no objection to hearsay statements by him.

702 F.Supp. 630 (W.D.Mich.1988) Judge Bell granted the plaintiff carriers summary judgment for recovery of funds collected by the defendant carrier owed to the plaintiffs for the shipping services they rendered in connection with interline shipments of freight. The defendant was insolvent and had numerous other creditors. Judge Bell held a constructive trust existed in favor of the plaintiffs. The court stated:

> Apart from those reasons cited in [*In the Matter of the*] *Ann Arbor Railroad* [*Co.*, 623 F.2d 480 (6th Cir.1980)] and [*In re*] *Penn Central* [*Transportation Co.*, 486 F.2d 519 (3d Cir.1973)] for finding an implied-in-fact trust relationship, grounds for recognizing a constructive trust are also present. A constructive trust arises by operation of law where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. *Michigan Bank v. Kahlich, Inc.*, 23 Mich.App. 483, 487, 179 N.W.2d 29 (1970), citing 5 Scott on Trusts (3d ed.) § 462.1, p. 3415. Although it is most commonly used as a remedial device where control of the subject assets is obtained by fraud, fraud is not the exclusive predicate. *Chapman v. Chapman*, 31 Mich.App. 576, 579–580, 188 N.W.2d 21 (1971). A constructive trust may also be imposed where, as here, one takes advantage of necessities (e.g. interline freight charge collection practices) to obtain assets under circumstances which render retention thereof unconscionable. *Children of the Chippewa, Ottawa and Potawatomy Tribes v. Regents of the University of Michigan*, 104 Mich.App. 482, 513, 305 N.W.2d 522 (1981).
>
> Here, E & LS has no legitimate claim to the subject interline funds. E & LS admits the funds are owed to plaintiffs. Although the Court may sympathize with E & LS in this time of financial hardship, the fact remains that E & LS has been and continues to be unjustly enriched at the expense of plaintiffs. Further retention of the funds is clearly unconscionable. Under these circumstances, a constructive trust represents an appropriate remedial device.

*Id.* at 633. *Missouri Pacific* was affirmed on the basis that *Ann Arbor* applies, which held that a trust relationship exists between railroads in the interline network. *Missouri Pacific Railroad Co. v. Escanaba and Lake Superior Railroad Co.*, 897 F.2d 210 (6th Cir.1990).

According to the undisputed proofs, it was the practice of Zwagerman to account for the sale of cattle to Bradley on the basis that the cattle sold at any particular time would be those which had been on the farm for the longest period of time—"first in, first out". This was recognized by Bradley as being a fiction as there was no feasible way to keep the cows separated. However, for economic reasons, cattle sold would typically be those having the greater weight. So, this accounting method was probably not far from the truth. Bradley delivered 1704 head after the April, 1985, outside purchase by Zwagerman. Since there were only 444 cattle on hand when Zwagerman went to see his attorney and Bradley was notified of the shortage, the court finds that all of the cattle on hand at the time the petition was filed were Bradley's cattle.

Bradley has more help in tracing than he would have as an ordinary bailor. As soon as Bradley's cattle were commingled by Zwagerman with his own and were treated the same as cattle owned by Zwagerman, there was a wrongful conversion. Bradley was then a *cestui que trust* of a constructive trust. *See id.*

In *Gillen v. Wakefield State Bank*, 246 Mich. 158, 224 N.W. 761 (1929), Colegrove, a livestock dealer, had done business with defendant bank for several years. It was his practice to purchase stock by writing a check on the bank and later covering it by depositing the proceeds of the resale. Any overdrafts were covered by blank notes

signed by him in advance. He and the bank suddenly realized that his overdraft amounted to $8,000.00, but the cashier told him to make shipments anyway. He understood that the checks he wrote to the sellers would be paid. Instead, the bank refused to honor those checks and set off the money deposited from the resale against former indebtedness. Several creditors filed a bill in the circuit court claiming Colegrove was insolvent and a receiver was appointed. A successor trustee filed a bill against the bank to establish a trust in funds set off by the bank. The Michigan Supreme Court held:

> If one person has obtained the property of another by false representations, unconscionable conduct, fraud, or deceit, a court of equity will convert the fraudulent holder of the property into a trustee for the use and benefit of the true owner, and preserve the property itself as a fund for the purpose of restitution to, or recompense of, the true owner thereof. 1 Perry on Trusts (6th Ed.), § 170. Trust property or property substituted for it may be recovered from the trustee, and all persons having notice of the trust. If the fund can be distinctly traced, the court will follow it and fasten the purpose of the trust upon it, unless the rights of innocent third parties have intervened. As against the trustee, the mingling of trust funds in a private deposit will not necessarily prevent their identification. If equity can follow the fund into the deposit, and it is still there, that is sufficient. In the absence of facts showing the contrary, the presumption is that money drawn out of a mixed deposit by the trustee for his own use is taken from the portion of the fund that is his own, whatever the relative dates of the deposits. The better opinion is that, even as to creditors, the mixing of trust funds with private funds in a general deposit does not obliterate the trust. *Carley v. Graves*, 85 Mich. 483, 48 N.W. 710 (24 Am.St.Rep. 99); *Cavin v. Gleason*, 105 N.Y. [256], 262, 11 N.E. 504; *Board of Fire & Water Com'rs of Marquette v. Wilkinson*, 119 Mich. 655, 78

N.W. 893 (44 L.R.A. 493); 2 Perry on Trusts (6th Ed.), § 828.

*Id.* at 169, 224 N.W. 761. *See also In re Anjopa Paper & Board Manufacturing Co.*, 269 F.Supp. 241 (S.D.N.Y.1967); *Bavely v. Ft. Thomas Bellevue Bank (In re Triple A Coal Co., Inc.)*, 55 B.R. 806 (Bankr.S.D.Ohio 1985); *Varon v. Salomon (In re Martin Fein & Co., Inc.)*, 43 B.R. 623 (Bankr.S.D.N.Y.1984); *Country Junction, Inc. v. Levi Strauss & Co. (In re Country Junction, Inc.)*, 41 B.R. 425 (W.D. Tex.1984); *Blair v. Trafco Products, Inc.*, 142 Mich.App. 349, 369 N.W.2d 900 (1985).

### *Preferential Transfer*

■ The Trustee seeks to recover all payments made by Zwagerman to Bradley during the 90 days immediately prior to filing. Recovery of preferences under 11 U.S.C. § 547 (1988) prevents debtors from thwarting the statutory order of distribution. It assumes equality of creditors of the same class. If Bradley received a preferential transfer from Zwagermans, he should be ordered to return it.

However, the first requirement is that the transfer be of an interest of the Debtor in the property. As indicated above, I find that the monies paid never belonged to the Zwagermans. They belonged to Bradley or at least were funds held by the Zwagermans as trustee of a constructive trust for the benefit of Bradley. As 4 Collier on Bankruptcy § 547.03[2] (15th ed. 1990) states "[a] transfer is preferential only if the property or the interest in property transferred belongs to the debtor.... The fundamental inquiry is whether the transfer diminished or depleted the debtor's estate." As indicated above, the cattle and proceeds of the sale of cattle were Bradley's assets and Zwagerman was merely acting as a conduit in forwarding payment for the cattle to Bradley.

■ But even if the Debtor was making a payment to Bradley on an antecedent indebtedness out of property that would have been an asset of the estate if the payment had not been made, I would find

that under the facts in this case, the Trustee would not be entitled to avoid the transfer because of 11 U.S.C. § 547(c)(2) (1988) which provides that:

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee:

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

The undisputed evidence was that once a sale was made, the proceeds were sent to Bradley and he returned Zwagerman's payment for the pounds gained during the time he was fed the cattle. There was one change made in this practice which allowed Zwagerman to deduct an allowance for shrinkage. While we know now that sometime during the course of the Bradley–Zwagerman operation, Zwagerman did not account to Bradley for a substantial number of cattle, Bradley was never notified of this conversion of cattle or funds. There is no evidence that, as to the last transactions, Zwagerman was not following the ordinary course of business as set by agreement between the parties and several years of doing business. Each check sent to Bradley was accompanied by an invoice indicating what cattle sales were made. It was stipulated by the parties that all of the sales as set forth in Exhibit B of the Stipulation between parties (Plaintiff's Ex. 1) prepared by Joan Zwagerman is an "accurate record of cattle sales made by the Debtor between August 1, 1985, and December 2, 1985." This exhibit provides the name of the purchaser, number of cattle, weight, and amount paid. It would appear that any conversion was prior to August 1, 1985, and that during the 90 day period prior to the Debtors' filing bankruptcy, the Debtors were following the ordinary course of business.

In *Waldschmidt v. Ranier (In re Fulghum Construction Corp.)*, 872 F.2d 739 (6th Cir.1989), the trustee brought suit against the sole stockholder of the debtor, and the partners of the stockholder to recover preferential payments. The court held that various loans and payments were in the ordinary course of business.

The Bankruptcy Code does not define "ordinary course of business" or "ordinary business terms." Moreover, the legislative history of the provision is notably "sparse." *See, WJM, Inc. v. Mass. Dept. of Pub. Welfare*, 840 F.2d 996, 1010 (1st Cir.1988). However, subsequent case law is in agreement that this section was intended to "protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the Debtor and the transferee." *In re Energy Co-Op Inc.*, 832 F.2d 997, 1004 (7th Cir. 1987). Congress enacted § 547(c)(2) "to leave undisturbed normal financial relations, because they do not detract from the general policy of the preference section to discourage unusual action by either the debtor or creditors during the debtor's slide into bankruptcy." *In re Advance Glove Mfg. Co.*, 761 F.2d 249, 251 (6th Cir.1985) (quoting S.Rep. No. 989, 95th Cong., 2d Sess. 88, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5874).

Despite the foregoing standards, there is no precise legal test which can be applied; rather, this court must engage in a "peculiarly factual" analysis. *In re First Software Corp.*, 81 B.R. 211, 213 (Bankr.D.Mass.1988). *See also In re Craig Oil Co.*, 785 F.2d 1563, 1565 (11th Cir.1986) (applicability of § 547(c)(2) turns on the specific events surrounding debtor's payments to defendant). The focus of this court's inquiry must be directed to an analysis of the business practices which were unique to the particular parties under consideration and not to the practices which generally prevailed in the industry of the parties. *See WJM, Inc. v. Massachusetts Dept. of*

*Pub. Welfare,* 840 F.2d 996, 1011 (1st Cir.1988) ("the cornerstone of this element of a preference defense is that the creditor needs demonstrate some consistency with other business transactions *between the debtor and the creditor* ") (quoting *In re Magic Circle Energy Corp.* 64 B.R. 269, 273 (Bankr.W.D.Okla. 1986)) (emphasis added). Even if the debtor's business transactions were irregular, they may be considered "ordinary" for purposes of § 547(c)(2) if those transactions were consistent with the course of dealings between the particular parties. *In re White,* 58 B.R. 266, 270 (Bankr.E.D.Tenn.1986) (payments by debtor were "ordinary" even if they were made on irregular basis and debtor was allowed to maintain a significant amount owing to creditor at all time). *See also In re Craig Oil Co.,* 785 F.2d 1563, 1566–67 (11th Cir. 1986) (examining past terms of business between the parties to determine if payments were made according to ordinary business terms).

*Id.* at 743.

### CONCLUSION

The court concludes that at the time of the filing of the petition for an order for relief, all cattle on hand were cattle belonging to Bradley or purchased with proceeds from the sale of Bradley's cattle. Also, the court finds that all monies paid by Zwagerman to Bradley during the period commencing 90 days prior to the date of the filing of the petition were from funds received from the sale of Bradley's cattle and were not property that would have otherwise become a part of the Debtor's estate. The court further finds that there was no preferential transfer made by Zwagerman to Bradley under 11 U.S.C. § 547(b) (1988), but even if there was, the Trustee cannot avoid the transfer because of 11 U.S.C. § 547(c)(2) (1988).

Therefore, an order may be entered dismissing the complaint of the Trustee and ordering the Trustee to turn over to Bradley the proceeds of all cattle sold after the filing of the petition, less any reasonable expenses incurred in preservation and sale of said cattle.