**In the Matter of Michael John PORTER and Rosalie Ellen Porter, Debtors.**

**MICHIGAN LIVESTOCK CREDIT CORPORATION, Appellant,**

v.

**Michael John PORTER and Rosalie Ellen Porter, Appellees.**

**United States Trustee, Chapter 11 Trustee.**

**No. 4:95cv082 AS.**

United States District Court, N.D. Indiana, Hammond Division.

Oct. 18, 1996.

David A. Rosenthal, Rosenthal Greives and O'Bryan, Lafayette, IN, for debtors/appellees.

Keith R. Fafarman, Gambs Mucker Bauman and Seeger, Lafayette, IN, Bruce T. Wallace, Hooper Hathaway Price Beuche and Wallace, Ann Arbor, MI, for appellant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

Michigan Livestock Credit Corporation ("Michigan Livestock") appeals from an order of the United States Bankruptcy Court holding that a pair of written agreements between the debtors and Michigan Livestock constitute disguised security devices rather than bailment contracts. Specifically, Michigan Livestock argues that it retained ownership of hogs which were in the debtors' possession on the petition date and challenges the bankruptcy court's decision that the Porters' adversary action to determine the extent, validity, and priority of the appellant's secured claim pursuant to 11 U.S.C. § 506(c) should go forward.

 Although the parties agreed to bifurcate the issues of liability and damages, and to submit the issue of liability to the bankruptcy court on stipulations of fact and evidence, the present appeal concerns only the issue of Michigan Livestock's status under the agreements. However, notwithstanding that there is continuing action in the underlying bankruptcy proceeding, this court has jurisdiction under 28 U.S.C. § 158(a) to hear Michigan Livestock's appeal from the order determining the nature of the parties' agreements. A bankruptcy order is considered "final" for purposes of § 158(a) when, as here, it "finally determines" one creditor's position. *See In re Morse Elec. Co., Inc.,* 805 F.2d 262, 264–65 (7th Cir.1986).

## I. BACKGROUND

The debtors, Michael and Rosalie Porter, are farmers engaged in a substantial farming operation in Cass and Carroll Counties in the State of Indiana. On the date of their Chapter 11 petition, the Porters' operation consisted of crop raising, hog breeding and feeding, and custom farming.[1]

The Porters entered into two separate agreements with the appellant on June 21, 1993, whereby the parties agreed that the debtors would feed and breed hogs pursuant to a compensation arrangement with Michigan Livestock.[2] Under the contracts, the hogs were to be supplied directly to the debtors by a livestock marketing firm designated by Michigan Livestock.[3] The parties stipulate that Michigan Livestock always paid for the new animals or credited the purchase price toward the Porters' account with the appellant. Upon reaching market weight, all feeder hogs were sold to slaughter houses in Michigan Livestock's name. The contracts further provided that all checks from the slaughter houses were to be made payable to Michigan Livestock, who then paid the Porters the amount they were due under the compensation arrangement.

The financing of the hog operation, including all costs and expenses for feed, supplements, medication and veterinary services, consulting services deeming necessary by the appellant, transportation to market, any tax imposed by federal, state, or local authorities,

---

1. "Custom farming" is a term of art in the livestock industry. In a custom farming arrangement, the farmer receives compensation for feeding and caring for livestock pursuant to an agreement with the owner of the livestock.

2. The compensation arrangement at issue here is not the first such agreement between the debtors and Michigan Livestock. The Porters previously entered into a livestock feeding contract (1991) and a livestock breeding contract (1992) with the appellant.

3. Under Section IX, Michigan Livestock reserved the right to charge the Porters a commission or placement fee for agreeing to place livestock in the program from another marketing firm.

death losses, losses from theft, fire, mysterious disappearances and acts of God, and casualty insurance, was to be borne by the Porters. The debtors also were required to provide Michigan Livestock with monthly live inventory reports, and to pay a "monthly service fee" calculated as a percentage of the value of the livestock shown on the monthly statements generated by Michigan Livestock. The service fee rate was subject to monthly adjustments, either upward or downward, depending upon the appellant's then-current cost of funding.[4]

In numerous provisions in the agreements, Michigan Livestock listed itself as the owner of the hogs. Section II of each contract required that the hogs supplied by Michigan Livestock be separated from other livestock and provided that they were the appellant's property unless and until the debtors exercised their option to purchase the hogs pursuant to Section XIV of the contracts. Under Section XIV, the debtors were precluded from selling, encumbering, relocating, or otherwise transferring any interest in the hogs. Although the Porters enjoyed the right to reject any of the hogs that did not meet their standards, the debtors' right of rejection was valid only at the time of delivery. Section X of the contracts required the debtors to market the finished hogs in Michigan Livestock's name with the designated livestock marketing firm. The Porters could purchase finished hogs by providing written notice to Michigan Livestock.

As security for the compensation arrangement, Section XIX of the contracts required the debtors to execute UCC–1 financing statements evidencing Michigan Livestock's ownership position, to be filed by the appellant.[5] Additionally, the contracts apportioned the entire risk of loss on the Porters,

and Michigan Livestock could terminate the contracts and take immediate possession of the livestock upon the Porters' material breach, or whenever Michigan Livestock deemed its equity position in the livestock to be endangered. The debtors enjoyed no converse right of termination. Finally, Michigan Livestock reserved the right to inspect the hogs at any time.

In the bankruptcy court, the Porters claimed that despite the language of the contracts, Michigan Livestock owned nothing more than a security interest in the hogs. Accordingly, the debtors commenced this adversary action against Michigan Livestock to determine the extent, validity, and priority of the appellant's secured interest in the hogs, claiming that they are entitled to recover from Michigan Livestock the reasonable, necessary post-petition costs and expenses of maintaining and protecting the appellant's secured property pursuant to § 506(c) of the Bankruptcy Code.[6] In submitting the issue to the bankruptcy court, the parties stipulated that the debtors had the opportunity to read the financing statements and contracts prior to voluntarily signing them, and that the Porters never communicated disagreement with the provisions of the same.

The bankruptcy court found that what Michigan Livestock has attempted to structure as bailment contracts are, in essence, disguised security devices. Accordingly, the court concluded that the debtors' adversary action to determine the extent, validity, and priority of Michigan Livestock's secured claim pursuant to § 506(c) should proceed. The appellant filed its timely notice of appeal from the bankruptcy court's order on October 6, 1995, and this court heard oral argument on May 30, 1996.

---

4. The actual compensation earned by the Porters under the agreements was the difference between the net proceeds of the sale of the finished hogs and the value of the hogs on Michigan Livestock's books at the time of the sale (using the first-in, first-out method of accounting), less monthly service fees, all marketing and promotional costs, transportation, insurance, and other fees and extraordinary expenses incurred by the parties in marketing the hogs. *See* Section XI, Exhibits A & B to Appellant's Brief.

5. The appellant filed financing statements with the recorders of Cass and Carroll Counties on June 17, 1993. A third financing statement included in the record on appeal, filed on March 15, 1991, is unclear as to its place of recordation.

6. Section 506(c) provides: "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c) (1994).

## II. DISCUSSION

This appeal presents but one issue for review: whether the contracts entered into by Michigan Livestock and the Porters created a bailment or a security interest in the hogs possessed by the Porters.[7] The appellant asks the court to remand this matter to the bankruptcy court with instructions to find that the contractual relationship between the parties was a bailment and that 11 U.S.C. § 506(c) is therefore inapplicable.[8]

### A. Standard of Review

█ In reviewing a bankruptcy court's decision pursuant to 28 U.S.C. § 158(a), the district court functions as an appellate court and is authorized to affirm, reverse, modify, or remand the bankruptcy court's ruling. Fed.R.Bankr.P. 8013. District courts review factual findings in bankruptcy cases under a clearly erroneous standard, while conclusions of law and the legal significance accorded to facts are reviewed *de novo*. *In re Sheridan,* 57 F.3d 627, 633 (7th Cir.1995); *Magill v. Newman (In re Newman),* 903 F.2d 1150, 1152 (7th Cir.1990); *see Borg–Warner Acceptance Corp. v. Fedders Fin. Corp. (In re Hammons),* 614 F.2d 399, 403 (5th Cir.1980); *Minnick v. Lafayette Loan & Trust Co. (In re Minnick),* 392 F.2d 973, 977 (7th Cir.), *cert. denied sub nom. Lusk v. Strickland,* 393 U.S. 875, 89 S.Ct. 170, 21 L.Ed.2d 146 (1968); *Harris v. Supreme Plastics, Inc. (In re Supreme Plastics, Inc.),* 8 B.R. 730, 734 (N.D.Ill.1980).

█ If the bankruptcy court's account of the factual evidence is plausible in view of the record in its entirety, the district court may not reverse even though convinced that as trier of fact it would have weighed the evidence differently. *In re Love,* 957 F.2d 1350, 1354 (7th Cir.1992); *see Anderson v.*

*City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). By contrast, *de novo* review of a bankruptcy court's legal conclusions and the legal significance accorded to facts requires the district court to make an independent examination of the bankruptcy court's judgment without giving deference to its analysis or conclusions. *See Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1210 (7th Cir.), *cert. denied,* 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984).

### B. Nature of the Compensation Arrangement

█ Michigan Livestock complains on appeal that the bankruptcy court disregarded the plain language of the contracts between the Porters and Michigan Livestock to fashion new agreements which are contrary to the parties' objective manifestations of intent. Specifically, Michigan Livestock argues that the agreements are classic agistment contracts[9]—a species of bailment—which unambiguously show that Michigan Livestock at all times owned the hogs. Thus, the appellant contends that the bankruptcy court committed reversible error by concluding that the agreements, rather than vesting ownership in the appellant, are in fact disguised security devices designed to obtain repayment of advances to the debtors.

█ It is undisputed that where the language of a written contract is unambiguous and unequivocal, its construction is for the court to decide as a matter of law. *Dykema v. Muskegon Piston Ring Co.,* 348 Mich. 129, 138, 82 N.W.2d 467, 472 (1957); *Osman v. Summer Green Lawn Care, Inc.,* 209 Mich.

7. Each agreement contains a choice of law provision stating that the contract is to be interpreted under the laws of the State of Michigan.

8. The issue of whether the agreements created a bailment or a security interest clearly is determinative of the applicability of § 506(c), which by its terms applies only to holders of "allowed secured claims." 11 U.S.C. § 506(c) (1994); *see Golden Plan of California v. Coben (In re Golden Plan of California),* 829 F.2d 705, 712 (9th Cir. 1986) ("Neither the legislative history nor case

law indicates that section 506(c) also applies to those asserting ownership, as opposed to a security interest, in property administered by the trustee.").

9. An agistment contract is "[a] particular kind of bailment under which a person, for consideration, takes animals for care and pasturing on his land, and the person who cares for the animals has a 'agister's lien' on the animals for that care." Black's Law Dictionary 66 (6th ed. 1990).

App. 703, 706, 532 N.W.2d 186, 188 (1995). In such cases, the court must determine the intent of the parties solely from the unambiguous terms of the document itself, and may not alter the contract based upon evidence beyond the words used in the instrument. *Michigan Chandelier Co. v. Morse*, 297 Mich. 41, 49, 297 N.W. 64, 67 (1941); *Moore v. Campbell, Wyant & Cannon Foundry*, 142 Mich.App. 363, 367, 369 N.W.2d 904, 906 (1985).

■ However, if the language of a written contract is reasonably subject to more than one interpretation or is facially inconsistent, the contract is ambiguous and the court must look to the facts surrounding the agreement to ascertain the parties' intent. *Sterner v. McLouth Steel Prods.*, 211 Mich.App. 354, 357, 536 N.W.2d 225, 227 (1995); *Stillman v. Goldfarb*, 172 Mich.App. 231, 239, 431 N.W.2d 247, 252 (1988); *Petovello v. Murray*, 139 Mich.App. 639, 642, 362 N.W.2d 857, 858 (1984). In determining whether a contract is ambiguous, the court is required to read the document as a whole. *See Osman*, 209 Mich. App. at 706, 532 N.W.2d at 188.

In determining that the contracts do not create bailments as the appellant claims, the bankruptcy court placed particular emphasis on several factors it found to be inconsistent with the bailment characterization, namely that the debtors were financially responsible for the purchase price of the hogs in the event of loss; the hogs guaranteed payment of the debtors' obligations to Michigan Livestock; there is no provision in the contracts by which the debtors could surrender the hogs and be free from the responsibilities of the contracts (despite a provision in the contracts which allowed the appellant to terminate its obligations at any time); the contracts provide that title to the hogs could pass to the debtors; and the "monthly service fee" due Michigan Livestock is not consistent with the notion of ownership represented by a bailment or agistment contract, but rather "looks conspicuously like interest due on a loan."

■ Notwithstanding the appellant's contention that the contracts unequivocally demonstrate Michigan Livestock's ownership of the hogs, this court finds that the bankruptcy court did not err by concluding that the agreements are ambiguous. Although the contracts contain numerous provisions stating that Michigan Livestock retains ownership of the hogs, the terms of the agreements could conceivably lend themselves to the interpretation that the appellant's status is that of a holder of a secured interest in personal property. Accordingly, this court finds that the bankruptcy court correctly determined that the agreements are subject to construction by the court.

■ The nature of a party's property interest is a question to be determined initially by state law. *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); *see Robinson v. Chicago Hous. Auth.*, 54 F.3d 316, 320 (7th Cir.1995). Under Michigan law, the concept of bailment [10] "imports the delivery of personal property by one person to another in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed and the property returned or duly accounted for when the special purpose is accomplished." *Goldman v. Phantom Freight, Inc.*, 162 Mich.App. 472, 479–80, 413 N.W.2d 433, 436 (1987).

■ Because the issue of the extent, validity, and priority of the appellant's secured interest in the hogs was submitted to the bankruptcy court on stipulations of fact and

---

10. Although this court is unable to find any Michigan cases specifically stating that agistment contracts are a species of bailment, it is clear from a review of the case law in other jurisdictions that an agreement to pasture, feed, and care for animals pursuant to an agistment contract is a bailment of the animals, provided there is an actual transfer of possession and control over the animals in question. *See, e.g., Lepel v. Hitch*, 468 F.2d 149, 151 (10th Cir.1972); *Robbins v. Comerica Bank–Detroit (In re Zwagerman)*, 115 B.R. 540,. 547 (Bankr.W.D.Mich.1990), *aff'd*, 125 B.R. 486 (W.D.Mich.1991); *Walker v. Nelson*, 137 Colo. 519, 523, 327 P.2d 285, 287 (1958) (en banc); *Bramlette v. Titus*, 70 Nev. 305, 309, 267 P.2d 620, 622 (1954); *Taghon v. Kuhn*, 497 N.W.2d 403, 405 (N.D.1993); *Barclay v. Burge*, 245 S.W.2d 1021, 1022 (Tex.App.1952); *Cornia v. Wilcox*, 898 P.2d 1379, 1383 (Utah 1995); *Hatley v. West*, 74 Wash.2d 409, 410 n. 1, 445 P.2d 208, 209 n. 1 (1968); 4 Am.Jur.2d *Animals* § 82 (1995).

evidence, this court is not bound by the clearly erroneous standard in deciding the present appeal. Rather, the court must independently determine the correctness of the ultimate legal conclusion adopted by the bankruptcy court—that the contracts do not create a bailment—on the basis of the facts relied upon by the bankruptcy judge. *In re Hammons,* 614 F.2d at 403 (district court had duty to independently examine evidentiary facts and determine their legal significance in light of all other facts established by the record); *In re Minnick,* 392 F.2d at 977; *Former Employees of Buyer's Club Mkts., Inc. v. Clark (In re Buyer's Club Mkts., Inc.),* 150 B.R. 787, 788 (D.Colo.), *aff'd,* 5 F.3d 455 (10th Cir.1993); *see Remes v. Acme Carton Corp. (In re Fasano/Harriss Pie Co.),* 71 B.R. 287, 290 (W.D.Mich.1987).

■ The bankruptcy court's concern that the Porters were strictly liable for the purchase price of the hogs in the event of loss is not sufficient reason to term the contracts security devices rather than bailment contracts. It is true that where a bailment is for the benefit of both parties, the bailee is normally liable only for his own negligence if the bailed goods are lost or destroyed. *Godfrey v. City of Flint,* 284 Mich. 291, 297, 279 N.W. 516, 518 (1938); *Fraam v. Grand Rapids & Ind. Ry. Co.,* 161 Mich. 556, 126 N.W. 851, 853 (1910); *Gray Eagles, Inc. v. Lucchesi,* 37 Mich.App. 322, 323, 194 N.W.2d 373, 374 (1971). The rule is no different for agistment contracts. *See Bramlette v. Titus,* 70 Nev. 305, 309, 267 P.2d 620, 622 (1954). However, nothing prevents a bailee from

> enlarg[ing] his legal responsibility for the subject of the bailment by contract, express or implied, even to the extent of making himself absolutely liable as insurer for the loss or destruction of goods committed to his care; ... As a general rule, if there is an express or implied agreement by the bailee that clearly goes beyond its ordinary obligation as implied by law, he will be held to his agreement. In such cases the bailment contract is controlling and must be enforced according to its terms, irrespective of the fact that a less onerous liability is imposed by law on bailees of the same class generally.

8 Am.Jur.2d *Bailments* § 150 (1980) (footnotes omitted) (alterations supplied); *id.* § 215; *cf. Johnston v. Miller,* 326 Mich. 682, 693-94, 40 N.W.2d 770, 774 (1950) ("The fact that a bailee has exercised the degree of care imposed on him by law is immaterial where the issue concerns some additional obligation to which he has subjected himself by his contract...."") (citation omitted). Thus, the fact that the Porters were strictly liable for the purchase price of the hogs in the event of loss, although inconsistent with a bailment arrangement absent contractual modification, does not eliminate the possibility that the agreements under scrutiny here create a bailment arrangement.

■ Similarly, the fact that the hogs guaranteed payment of the debtors' obligations to Michigan Livestock fails to establish that the agreements are something other than bailment contracts. While it is certainly reasonable to believe that the hogs would be used as collateral if the contracts were security agreements, it is also reasonable to expect that a bailor would reserve the right to repossess bailed goods in the event of the bailee's failure to perform under a bailment arrangement. Here, the contracts allowed Michigan Livestock to repossess the livestock upon the debtor's material breach or whenever the appellant deemed its equity position to be endangered. Therefore, while the hogs did secure the debtors' performance, that fact in itself is not determinative of the appellant's status either as owner or holder of a security interest in the livestock.

■ The bankruptcy court also found that the debtors' inability to surrender the hogs and be free of their obligations—despite a provision in the contracts which allowed Michigan Livestock to terminate the agreements at any time—was indicative of a security agreement rather than a bailment. However, notwithstanding the bankruptcy court's apparent concern about the fairness of such an arrangement, this court has been unable to find case law in support of the proposition that a contract for bailment must permit the bailee to surrender the bailed goods at any time if the bailor enjoys a converse right of termination. Indeed, a bailee who takes delivery of personal proper-

ty in a bailment arrangement agrees to *faithfully execute the trust* and return the property or duly account for it when the special purpose is accomplished. *Goldman,* 162 Mich.App. at 479–80, 413 N.W.2d at 436; *see* 8 AM.JUR.2D *Bailments* § 2 (1980).

This court is not persuaded by the bankruptcy court's statement that one of the discriminating features of a classic bailment contract is the bailee's ability to "surrender the property *at any time* and be relieved of further liability on the contract." Bankr.Order (Sept. 26, 1995) at 5 (emphasis supplied) (citing 8 AM.JUR.2D *Bailments* §§ 38–39). The authority cited by the bankruptcy court attempts to draw a comparison between the relative obligations of purchasers in conditional sale arrangements and bailees in bailment leases or bailments for hire:

> In a conditional sale, possession is delivered on an agreement to sell and buy, with title to the property to remain in the seller until payment of the price or performance of some condition specified, while in a bailment the bailee receives possession but not title to the goods for a particular purpose and usually on an agreement, express or implied, to redeliver them to the bailor after the purpose of the bailment has been fulfilled. A conditional sale imports an absolute obligation on the part of the purchaser to pay the purchase price, while a bailee may relieve himself of further liability by surrender of the property, and in a bailment for hire by payment for use of the thing let or bailed.

8 AM.JUR.2D *Bailments* § 39 (1980) (footnotes omitted). In this court's estimation, the reference to the surrender of bailed property, when read in the proper context, relates to redelivery of the goods *after the purpose of the bailment has been fulfilled,* not to surrender of the goods "at any time" as the bankruptcy court suggests. In sum, this court finds that the debtors' inability to surrender the hogs and be free of their obligations fails to support the bankruptcy court's decision that the agreements are inconsistent with the bailment characterization.[11]

The fact that title to the hogs could pass to the debtors under the contracts likewise is not in itself a valid ground for deciding that the agreements are disguised security devices rather than bailment contracts. Despite the bankruptcy court's statement that one of the discriminating features of a classic bailment is that "title will not pass to the bailee under any circumstances," Bankr.Order (Sept. 26, 1995) at 5 (citing 8 AM.JUR.2D *Bailments* §§ 38–39), this court is unable to locate any passage within the source cited by the bankruptcy court which makes a statement to that effect. Moreover, the authority cited by the bankruptcy court clearly allows elsewhere for bailment arrangements in which the bailee has the option to purchase the bailed property:

> [T]ransactions of this character may be grouped in two classes. The first includes transactions in which it is contemplated, apparently as the principal feature, that the bailee, though under obligation to return or account for the property, may, after ascertaining that it is satisfactory or suitable for his purposes, determine the bailment by purchasing the property.... The second class embraces those agreements in the nature of "leases" of personal property, in which the chief feature in the contemplation of the parties appears to be the letting of the chattel for hire for a stipulated term, with an option to the lessor to purchase it at or before expiration of the term at an agreed price, credit to be given for all or a portion of the amount paid for the use.

8 AM.JUR.2D *Bailments* § 40 (1980) (footnotes omitted) (alterations supplied); *see Knights v. Piella,* 111 Mich. 9, 13, 69 N.W. 92, 93 (1896); *Dunlap v. Gleason,* 16 Mich. 158 (1867). Accordingly, the court gives no weight to the fact that title to the hogs could pass to the debtors under the contracts.

Finally, the bankruptcy court concluded that the "monthly service fee" due Michigan Livestock under the contracts, rather than indicating the type of ownership represented by a bailment or agistment con-

---

**11.** Additionally, the court notes that the inability to surrender property securing payment of a borrower's obligation is not a distinguishing feature of most security agreements.

tract,[12] is "alarmingly" similar to monthly interest due on a loan. The bankruptcy court noted that it had been unable to find any agistment cases in which the bailee was required to make payments to the bailor based on the cost of the animals subject to the bailment contract. This court similarly has been unsuccessful in locating an agistment case of that nature. However, the fact that there appear to be no reported *agistment* cases in which a bailee was required to pay a fee to the bailor does not end the court's inquiry.

As discussed above, agistment contracts are a species of bailment, and it is clear that there are certain types of bailment arrangements in which the bailee is required to pay for the use of the bailed property. For example,

[c]ontracts that may be classified as bailments with privilege of purchase frequently provide, either absolutely or contingently, that payment shall be made for the use of the property during the term of the bailment or until exercise of the privilege of purchase. If the agreement is that the party who receives possession of the property is to retain it for a definite period, and that if, at or before the expiration of that period, he pays for the property he is to become the owner, otherwise to pay for its use, the transaction is a bailment and title to the property . . . remains in the bailor until the price is paid.

8 AM.JUR.2D *Bailments* § 41 (1980) (alterations supplied) (footnotes omitted); *see Veterans Rehabilitation Ctr., Inc. v. Birrer,* 170 Mont. 182, 187, 551 P.2d 1001, 1004 (1976). Here, the Porters received possession of the hogs with the intention of using them to earn a profit on their weight gain. The contracts also provided that the debtors could purchase the hogs before they reached finished weight, subject to the terms of purchase provided by the appellant. Thus, although the contracts between Michigan Livestock and the Porters contain a fee provision not found in any

reported agistment cases, that fact is not conclusive evidence that the agreements are disguised security devices rather than bailment contracts. Indeed, such a provision appears to be consistent with the type of terms found in certain bailment contracts.

■ Therefore, in light of the above discussion, the issue of Michigan Livestock's status under the agreements ultimately turns on the question of whether the Porters' possession and control over the hogs was consistent with that found in a bailment arrangement. *See Orton v. Markward & Karafilis, Inc.,* 83 Mich.App. 548, 551, 269 N.W.2d 219, 221 (1978) ("[T]here must be a full transfer to the bailee so as to exclude the possession of the owner and all other persons and to give the bailee the sole custody and control thereof."); *see also McPherson v. Belnap,* 830 P.2d 302, 305 (Utah Ct.App.1992) ("The requirement is only that the bailee have the right to exclude all persons not covered by the agreement and to control the property."). The facts to which the parties stipulated in the bankruptcy court certainly suggest that the debtors had possession of the hogs, at least in the most basic, physical sense. However, the court must look to the terms of the parties' arrangement to determine whether the Porters had the degree of possession and control necessary to establish a bailment.

The bankruptcy court noted in its decision that under the contracts, "the debtors either directly or indirectly funded the entire hog operation[,] from the feed, medical care, personal property taxes, insurance and risk of loss, on down ·to the 'monthly service fees' and the hogs' purchase price." Bankr.Order (Sept. 26, 1995) at 9–10 (alteration supplied). This court understands the bankruptcy court's statement, at base, to reflect a concern that the debtors bore more responsibility under the agreements than a bailee would bear.

Although the type of financing for which the Porters were responsible is typical of

---

12. In support of its statement that a "monthly service fee" is inconsistent with the notion of ownership represented by a bailment contract, the bankruptcy court notes that compensation for the goods and services contributed by a bailee usually is by a set rate or a division of the sale proceeds. *See* Bankr.Order (Sept. 26, 1995) at 10. However, this court is unable to see how the type of compensation paid to a *bailee* is relevant to a discussion of the effect of a monthly service fee paid to a *bailor*.

that borne by the owners of livestock, it is important to note that this level of funding is not necessarily inconsistent with a bailment. Indeed, a number of the terms which the bankruptcy court puts forth as evidence that no bailment existed also tend to support the opposite conclusion. For example, in *Taghon v. Kuhn,* 497 N.W.2d 403 (N.D.1993), the Supreme Court of North Dakota affirmed the trial court's decision that the degree of control necessary for a bailment does not exist where the alleged bailors remain responsible for sick animals; retain unrestricted access to the pasture; and bear the risk of loss. 497 N.W.2d at 405–06.

In the present case, the contracts did allow the appellant's representatives to conduct inspections of the hogs "at any time," and further provided that Michigan Livestock was entitled to take possession of the livestock "without notice." However, the agreements also provided that the Porters were responsible for the care of sick animals and bore the risk of loss by death. Such control is consistent with the degree of possession and control required to establish a bailment. *Id.; see Robbins v. Comerica Bank–Detroit (In re Zwagerman),* 115 B.R. 540, 542 (Bankr.W.D.Mich.1990) (loss of cattle by death borne by bailee), *aff'd,* 125 B.R. 486 (W.D.Mich.1991). In addition, the agreements permitted the Porters to make decisions about the appropriate care to be given the hogs, and required the debtors to provide transportation to market at their own cost. Finally, the debtors had absolute discretion under the contracts to decide which hogs to sell, and when to sell them. These elements of control have been found to be relevant to the determination of whether a bailment exists. *See Rohweder v. Aberdeen Prod. Credit Ass'n,* 765 F.2d 109, 113 (8th Cir.1985).

It is certainly true, as the bankruptcy court observed, that a court is not bound by the parties' designations in a contract where such terms elevate form over substance. *See Heryford v. Davis,* 102 U.S. (12 Otto.) 235, 243–44, 26 L.Ed. 160 (1880); *Moulton v. Lobdell–Emery Mfg. Co.,* 322 Mich. 307, 310, 33 N.W.2d 804, 806 (1948). Put simply, the substance of a contract, and not its form, controls the legal effect of such an instru-

ment. However, notwithstanding the bankruptcy court's conclusion that construction of the present agreements as bailments exalts form over substance, the contracts' repeated reference to Michigan Livestock's ownership of the hogs appears to be more than mere form. Rather, the substance of the contracts is consistent with a modified bailment arrangement.

With the possible exception of Michigan Livestock's unrestricted access to the hogs, no other provision in the agreements is inconsistent with a bailment arrangement. Moreover, even the appellant's unlimited access to the livestock, at least in terms of its ability under the contracts to take immediate possession of the hogs, is not inconsistent with a bailor's right as titleholder to recover his personal property before the special purpose of the bailment has been accomplished. Additionally, nothing about the contracts suggests that they were drafted as a means of obtaining repayment for advances made to the debtors, as security devices typically are. Rather, the agreements are drafted for the mutual benefit of the parties—Michigan Livestock benefited from the sale of the hogs, while the Porters profited as a result of the animals' weight gain while in their possession.

Finally, and perhaps most importantly, the entrustment of the animals for the special purpose of fattening them to market weight is consistent with a bailment arrangement. Conversely, the provision by which the debtors could purchase hogs prior to their reaching market weight—a provision perhaps more in keeping with a security arrangement—is of secondary importance in the parties' agreement. In sum, the agreements between the parties did not create a security arrangement whose primary purpose was ultimately to vest title to the property in the debtors. Instead, the agreements each contained a provision—as an alternative to their primary purpose—by which the debtors could take title *subject to the appellant's approval.* Such a scenario is not consistent with the disguised security device conceived by the bankruptcy court.

As discussed above, this court is entitled to independently determine the correctness of

the ultimate legal conclusion adopted by the bankruptcy court, without giving deference to its analysis. In accordance with this *de novo* standard of review, the court concludes that the bankruptcy court erred as a matter of law in determining that, under the facts stipulated, the contracts create a disguised security device rather than a bailment. Moreover, even were this court bound by the clearly erroneous standard in reviewing the bankruptcy court's determination, the court would nonetheless be left with the definite and firm conviction that the bankruptcy court has committed a mistake. Such an impression is sufficient to allow the court to reverse the decision below. *See In re Thirtyacre,* 36 F.3d 697, 700 (7th Cir.1994). Accordingly, the bankruptcy court's judgment is vacated and remanded.

## CONCLUSION

For the reasons described above, the judgment of the bankruptcy court is **VACATED.** This cause of action is **REMANDED** to the bankruptcy court for further proceedings consistent with this opinion. **IT IS SO ORDERED.**