·In re Bradley Gene HAASE, Debtor.

Charles E. COVEY, Chapter 7
Trustee for Bradley Gene
Haase, Plaintiffs,

v.

COMMUNITY NATIONAL BANK
in Monmouth, Defendant.

INTERSTATE PRODUCERS LIVE-STOCK ASSOCIATION, an Illinois Corporation, Intervenor, Third Party Plaintiff,

v.

Charles E. COVEY, Chapter 7 Trustee for Bradley Gene Haase; Community National Bank in Monmouth, a banking corporation, Third Party Defendants.

Bankruptcy No. 95–82741.
Adversary No. 96–8054.

United States Bankruptcy Court,
C.D. Illinois.

Sept. 10, 1998.

Barry M. Barash, Barash & Stoerzbach, Galesburg, IL, for debtor.

Thomas O'Neal, Westervelt, Johnson, Nicoll & Keller, Peoria, IL, for plaintiff.

Robert Lindstrom, Mustain, Lindstrom & Henson, Galesburg, IL, for defendant.

## OPINION

WILLIAM V. ALTENBERGER, Chief Judge.

Before the Court are the motions for summary judgment filed by the Community National Bank in Monmouth (BANK) against the complaint of CHARLES E. COVEY, Chapter 7 Trustee, (TRUSTEE)[1] and against the third party complaint of Interstate Producers Livestock Association (INTERSTATE). At issue here are the proceeds from three separate sales of cattle by Bradley Gene Haase (DEBTOR); the cattle being those in the care of the DEBTOR under an agreement with INTERSTATE and those purchased by the DEBTOR from Wilson Cattle (WILSON) and from Producers Livestock (PRODUCERS).

Prior to the filing of this bankruptcy case, the DEBTOR owned and operated a cattle business where he bought and sold cattle and fed and raised cattle for both himself and third parties. To finance the business, on April 14, 1995, the DEBTOR entered into a revolving loan agreement with the BANK. The DEBTOR also maintained a checking account for his livestock business at the BANK.

On July 10, 1995, the DEBTOR and INTERSTATE entered into an agreement for the custom feeding of ninety head of cattle. Under the terms of the agreement, title to the cattle was to remain in INTERSTATE and INTERSTATE was to make all decisions regarding the marketing of the cattle. On October 28, 1995, the DEBTOR acquired 72 head of cattle from WILSON, without paying for them. On that same day, the DEBTOR sold the cattle for $34,380.00. The

---

**1.** This adversary proceeding was originally brought by the Chapter 13 Trustee. When the DEBTOR's bankruptcy case was subsequently converted to one under Chapter 7 of the Bankruptcy Code, the Chapter 7 Trustee continued the litigation. This Court shall refer to the Chapter 7 Trustee as "TRUSTEE."

proceeds were deposited in the checking account at the BANK on October 30, 1995.[2]

At the end of October, the DEBTOR became aware that his brother, Greg Haase, who was also a signatory on the checking account at the BANK, had written checks for amounts larger than he had disclosed to the DEBTOR and that Greg Haase had transferred funds from the checking account to other accounts held by him alone. Greg Haase's authority to write checks was terminated on October 31, 1995. On that same day, the BANK was paid $61,532.88 on its loan.

On November 1, 1995, the DEBTOR acquired 54 head of cattle from PRODUCERS without paying for them, which he subsequently sold, depositing the proceeds into the checking account at the BANK. The DEBTOR was unable to completely identify the proceeds from the sale. According to his deposition, he recalled that nineteen head of cattle were sold to Rock Island Livestock on November 6, 1995, for $9,327.24 and that the remaining cattle were sold to Brennan Cattle Company. The TRUSTEE alleges that the cattle were sold on November 1, 1995, for $12,635.00. On November 1, 1995, the DEBTOR issued a check to PRODUCERS for payment of the cattle in the amount of $12,494.62.

The DEBTOR borrowed an additional $20,000.00 from the BANK on November 3, 1995, in order to cover a check written to Creston Livestock in the amount of $29,-415.44 for the purchase of sixty head of cattle. On November 4, 1995, the DEBTOR sold eighty-five head of cattle to the Rock Island Livestock Auction, seventy-five of which were subject to the INTERSTATE agreement, for a total amount of $32,760.70.[3]

On November 6, 1995, the DEBTOR issued a check to WILSON in the amount of $34,-096.24.

On November 7, 1995, the DEBTOR, knowing that there would not be sufficient funds in the account at the BANK to cover all the outstanding checks, telephoned the BANK and discussed his concerns with Mr. Doug Hardin, an employee of the BANK. The DEBTOR authorized the BANK to debit the checking account in the amount of $39,-827.13, leaving one dollar in the account, and to apply the funds to the BANK's loan. One dollar was left in the account at Mr. Hardin's suggestion, in order that the amount of the insufficiency could be determined. Neither the check to WILSON or PRODUCERS cleared the account. On Nov. 8, 1995, the BANK received a payment on the loan in the amount of $19,868.56, from the sale of the DEBTOR's cattle, leaving a balance due of $15,311.81. On Nov. 29, 1995, the BANK received another payment from the sale of cattle in the amount of $1,075.31.

The DEBTOR filed a Chapter 13 case in bankruptcy on November 27, 1995. INTERSTATE, PRODUCERS and WILSON were listed as unsecured creditors. The Chapter 13 Trustee in Bankruptcy (CHAPTER 13 TRUSTEE) sued the BANK under § 547 of the Bankruptcy Code, 11 U.S.C. § 547, to recover, as a preference, the $39,827.13 taken from the checking account on November 7, 1995. INTERSTATE was permitted to intervene and it filed a two count third party complaint against the CHAPTER 13 TRUSTEE and the BANK to recover the $39,827.13, which INTERSTATE alleged were the proceeds from the sale of its cattle. The TRUSTEE filed an amended complaint,

2. The actual deposit to the checking account was in the amount of $79,535.39. The DEBTOR's records reflect that sixty steers were sold for $29,638.44 and thirty-eight steers were sold to Morrison Cattle Company for $49,896.95. The DEBTOR testified in his deposition that the seventy-two steers purchased from WILSON were included in these amounts.

3. In his answer to the third party complaint, the TRUSTEE states that he is unable to specifically distinguish the INTERSTATE cattle, and suggests the following apportionment:

On November 4, 1995, [the DEBTOR] sold 94 head of cattle at Rock Island Livestock Auction, Inc. Of that amount, 75 head were financed by INTERSTATE, 10 were purchased by [the DEBTOR] from Jeff Haase, and 9 were obtained by [the DEBTOR] from Greg Haase. Thus, of the 94 head, 20.21% are not subject to INTERSTATE's claim.

The TRUSTEE admits that the total received for the 94 head was $39,827.13; and thus, 20.21% of that amount should be excluded ($8,013.22), and 79.79% ($31,813.91) is the correct amount of the proceeds.

alleging that the deposit of the proceeds of the sales of the cattle purchased from WILSON and PRODUCERS and the cattle subject to the INTERSTATE agreement, aggregating $75,921.04, into the DEBTOR's checking account at the BANK, was a preferential transfer. The BANK filed a motion for summary judgment as to the TRUSTEE's complaint and a motion for summary judgment as to INTERSTATE's third party complaint, which were heard and taken under advisement.

Turning first to the BANK's motion for summary judgment against INTERSTATE on the third party complaint, the BANK argues that it holds a validly perfected security interest in the sale proceeds deposited into the checking account. The BANK further argues that it was a holder in due course and that the funds it received from the sale of the INTERSTATE cattle were taken free of any ownership interest of INTERSTATE. In response, INTERSTATE contends the agreement between it and the DEBTOR is an agistment contract and that INTERSTATE was the owner of the cattle.[4] The BANK's motion raises two issues. First, was INTERSTATE the owner of the cattle? Second, if so, did the BANK's security interest, or its status as holder in due course, give it priority over INTERSTATE's ownership interest?

■ A resolution of the first of these two issues also affects the TRUSTEE's claim against the BANK, because if INTERSTATE owned the cattle and is entitled to the proceeds, they are not property of the estate and not subject to recovery by the TRUSTEE under § 547. That section permits a trustee to recover a debtor's interest in property. Section 541 of the Bankruptcy Code, 11 U.S.C. § 541, defines property of the estate in part as follows:

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

. . .

(b) Property of the estate does not include—

(1) any power that the debtor may exercise solely for the benefit of an entity other than the debtor; . . . .

While Congress intended to define "property of the estate" in the broadest possible sense, see 5 Collier on Bankruptcy ¶ 541 .01 (15th Rev.Ed.1997), and the courts have given such an interpretation to that phrase, see Matter of Continental Airlines, Inc., 134 B.R. 536 (Bkrtcy.D.Del.1991), property held by a debtor as a bailee or agent is not property of a debtor's bankruptcy estate. 5 Collier on Bankruptcy ¶ 541.06(1) and (1)(a) (15th Rev. Ed.1997).

Returning to the first of the two issues, the agreement between the DEBTOR and INTERSTATE provides, in part, as follows:

4. (a) TITLE TO THE CATTLE COVERED BY THIS AGREEMENT SHALL AT ALL TIMES REMAIN IN IPLA. PURSUANT TO THAT, FEEDER AGREES THAT THE CATTLE HEREUNDER SHALL BE KEPT SEPARATE FROM ANY OTHER LIVESTOCK OF FEEDER. UNDER NO CIRCUMSTANCES SHALL FEEDER SELL, TRANSFER, PLEDGE, MORTGAGE, OR HYPOTHECATE SAID CATTLE, OR ATTEMPT TO DO SAME.

(b) Feeder agrees to execute the appropriate UCC–1 Financing Statements to be recorded by IPLA, as a means of public notification of IPLA's ownership of the cattle hereunder.

5. Feeder agrees that all decisions concerning the marketing of the cattle, including the determination of correct market weight and time of sale, shall be made by

---

4. INTERSTATE did not file a motion for summary judgment, though it seems it may have believed that it did. On February 9, 1998, INTERSTATE filed a "Supplemental Memorandum In Support of Motion Summary Judgment of INTERSTATE PRODUCERS LIVESTOCK ASSOCIATION."

IPLA, the owner of the cattle, after consultation with Feeder.

13. Feeder covenants that the following persons or entities are creditors with an interest in his grain; the land, buildings, or personal property and equipment at the site where the cattle are to be fed; or other livestock owned by Feeder:

Monmouth, Illinois.

Feeder understands and agrees that IPLA will be contacting the above-listed creditors to inform them of the details of the arrangement covered by this Agreement, and specifically to indicate to them that the cattle being placed at Feeder's feeding location are the property of IPLA.

The DEBTOR also signed a Uniform Commercial Code financing statement, which was filed with the Warren County recorder of deeds, that described the covered property as:

| 90 | Total Head | | Contract 4764 | | |
|----|-----------|---------|--------|------|-------|
| 90 | Steers | Heifers | Calves | Cows | Bulls |

Located in Monmouth, IL—The purpose of this financing statement is to put on public notice the abovementioned participating feeder has on his premises or under his care, feeder cattle that are owned by Interstate Producers Livestock Association. The participating feeder has no rights to sell or relocate said feeder cattle without owner's written permission. A complete description of said cattle is on file at Interstate Producers Livestock Association's home office (address above).

INTERSTATE relies on *In re Porter,* 202 B.R. 109 (N.D.Ind.1996), a case involving an agistment contract for hogs, which the district court concluded was equivalent to a bailment.[5] Like the agreement in the present case, the contract in *Porter* provided that the animals be separated from other livestock and that the animals would remain the property of the livestock company unless the debtors exercised the option to purchase the animals. The debtors were prohibited from selling, encumbering, relocating or otherwise transferring any interest in the animals. Reversing the bankruptcy court's determination that the agreement was in fact a disguised security agreement, the district court in *Porter* concluded:

It is certainly true, as the bankruptcy court observed, that a court is not bound by the parties' designations in a contract where such terms elevate form over substance. (Citations). Put simply, the substance of a contract, and not its form, controls the legal effect of such an instrument. However, notwithstanding the bankruptcy court's conclusion that construction of the present agreements as bailments exalts form over substance, the contracts' repeated reference to Michigan Livestock's ownership of the hogs appears to be more than mere form. Rather, the substance of the contracts is consistent with a modified bailment arrangement.

With the possible exception of [the livestock company's] unrestricted access to the hogs, no other provision in the agreements is inconsistent with a bailment arrangement. Moreover, even the [livestock company's] unlimited access to the livestock, at least in terms of its ability under the contracts to take immediate possession of the hogs, is not inconsistent with a bailors right as titleholder to recover his personal property before the special purpose of the bailment has been accomplished. Additionally, nothing about the contracts suggest that they were drafted as a means of obtaining repayment for advances made to the debtors, as security devices typically are. Rather, the agreements are drafted for the mutual benefit of the parties—[the livestock company] benefitted from the sale of the hogs, while the [debtors] profited as a result of the animals' weight gain while in their possession.

Finally, and perhaps most importantly, the entrustment of the animals for the special purpose of fattening them to market weight is consistent with a bailment arrangement. Conversely, the provision

---

5. The court in *Porter* defines an agistment contract as:

"[a] particular kind of bailment under which a person, for consideration, takes animals for care and pasturing on his land, and the person who cares for the animals has a 'agister's lien' on the animals for that care." Black's Law Dictionary 66 (6th ed.1990).

by which the debtors could purchase hogs prior to their reaching market weight—a provision more in keeping with a security arrangement—is of secondary importance in the parties' agreement. In sum, the agreements between the parties did not create a security arrangement whose primary purpose was ultimately to vest title to the property in the debtors. Instead, the agreements each contained a provision—as an alternative to their primary purpose—by which the debtors could take title *subject to the [livestock company's] approval.* Such a scenario is not consistent with the disguised security device conceived by the bankruptcy court. (Emphasis in original).

Other cases relied on by INTERSTATE also support its position. *See In re Zwagerman,* 115 B.R. 540 (Bkrtcy.W.D.Mich.1990), *aff'd* 125 B.R. 486 (W.D.Mich.1991).

■ In the case before this Court, there is no dispute that INTERSTATE entrusted the cattle to the DEBTOR for the special purpose of fattening them for market. The substance of the agreement between the DEBTOR and INTERSTATE was a bailment agreement. It follows that INTERSTATE owned the cattle and that the cattle were not property of the DEBTOR's estate. Having determined that INTERSTATE was the owner of the cattle it delivered to the DEBTOR, this Court will next consider the BANK's argument that its security interest, or its status as a holder in due course, gave it priority over INTERSTATE's ownership interest. The first part of the argument is easily decided against the BANK. Under § 9–203 of the Uniform Commercial Code as adopted in Illinois, in order for the BANK to acquire a security interest, the DEBTOR must have "rights in the collateral". 810 ILCS 5/9–203. However, where animals are delivered to a debtor, pursuant to a bailment, for fattening, with the bailor retaining title and ownership, a debtor obtains no rights to the animals to which a security interest could attach. *See State Bank of Young America v. Wagener,* 479 N.W.2d 92, 16 UCC Rep. Serv.2d 1189 (Minn.App.1992).

■ The second part of the BANK's argument is that it was a holder in due course, under § 3–302 of the Uniform Commercial Code as adopted in Illinois, 810 ILCS § 5/3–302, and took the check for the proceeds from the sale of the INTERSTATE cattle free and clear of any interest of INTERSTATE. INTERSTATE contends that the holder in due course rule is not applicable, because the BANK seeks to retain the monies and not the check itself.

Article 3 of the Uniform Commercial Code as adopted in Illinois applies to "negotiable instruments". It governs the rights and obligations of those who are parties to or are in possession of negotiable instruments. *Western Group Nurseries, Inc. v. Pomeranz,* 867 P.2d 12, 20 UCC Rep.Serv.2d 1179 (Colo. App.1993). In the case before this Court, the DEBTOR sold INTERSTATE's cattle through the Rock Island Livestock Auction, which issued its check to the DEBTOR drawn on its bank, which check was deposited by the DEBTOR into the checking account at the BANK. If this were a dispute between any of the parties to that transaction, i.e., the DEBTOR, the auction house, or either bank, Article 3 would be applicable. However, the dispute in this case does not involve the parties to the check. It involves INTERSTATE, a bailor, whose bailed property was improperly sold, who was not a party to the check or the transaction giving rise to it. As such, Article 3 has no application to determine the rights and obligations between a bailor, whose property was improperly sold, and a third party, the BANK, which ultimately received the proceeds.

■ As a general rule, a bailor may maintain an action to recover possession of bailed property, or its value, from a third party who has acquired possession by a wrongful act of the bailee, such as by a wrongful sale, regardless of the good faith of the third party. Whether INTERSTATE can recover from the BANK under such a concept has not been raised by the BANK's motion for summary judgment on INTERSTATE's third party complaint. All the BANK's motion raises is whether its status as a secured creditor or a holder in due course of the check prevents INTERSTATE's recovery of the funds arising out of the sale of its cattle.

■ The BANK has also filed a motion for summary judgment on the complaint filed by the TRUSTEE. The BANK makes essentially three arguments. First, the BANK suggests that the cattle did not belong to the DEBTOR because he did not pay for them and concludes that the TRUSTEE cannot recover the funds because the DEBTOR had no interest in the proceeds from their sale. Unlike the cattle subject to the INTERSTATE agreement, as to the cattle the DEBTOR acquired from WILSON and PRODUCERS, neither a bailment nor an agency relationship existed. At the oral argument, the TRUSTEE argued that the DEBTOR "purchased" the cattle. The BANK did not take issue with that characterization and in fact, copies of the invoices are a part of the record. The invoice from WILSON provides:

> All sales are made and title is transferred, subject to final payment in cash or solvent credit. If any check, draft, or other instrument tendered in payment is not paid promptly on presentation, this bill of sale does not transfer title and shall be null and void, and of no effect. Wilson Sale Company.

Notwithstanding the language of the WILSON invoice, the BANK's argument has no merit. Section 2–401 of the Illinois Uniform Commercial Code, 810 ILCS 5/2–401, provides, in part:

> § 2–401. Passing of Title; Reservation for Security; Limited Application of this Section. Each provision of this Article with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this Article and matters concerning title become material the following rules apply:
>
> (1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (Section 2–501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this Act. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the Article on Secured Transactions (Article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.
>
> (2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading
>
> (a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; and
>
> (b) if the contract requires delivery at destination title passes on tender there.
>
> (3) Unless otherwise explicitly agreed where delivery is to be made without moving the goods,
>
> (a) if the seller is to deliver a document of title, title passes at the time when and the place where he delivers such documents; or
>
> (b) if the goods are at the time of contracting already identified and no documents are to be deliver, title passes at the time and place of contracting.

Therefore, under § 2–401, title to the cattle did transfer to the DEBTOR regardless of whether he paid for them.

■ The BANK also asserts that it held a security interest in the DEBTOR's inventory and when the sale proceeds were deposited into the checking account it acquired a lien in those monies, so that when the funds were paid over to the BANK there was no diminution of the bankruptcy estate. The TRUSTEE does not dispute that the BANK had a

# 680

first lien on the cattle or the deposit account. Rather, the TRUSTEE contends that the BANK improved its position in the amount of $75,921.04 within a month of the bankruptcy filing. As a general rule, the BANK is correct that in order for there to be a recoverable preference there must be a diminution of the DEBTOR's estate. A classic example of such not occurring is the situation where a lender holds a lien on a debtor's inventory and its proceeds. The debtor makes a payment on the loan. The payment reduces the loan balance and the amount of the lender's claim to its security. The amount of the inventory, no longer subject to the lender's lien, is now available for unsecured creditors. There was no diminution of the debtor's estate, as the payment was canceled out by the freeing of inventory from the creditor's secured claim.

■ Although, the TRUSTEE does not specifically allege § 547(c)(5) of the Bankruptcy Code, 11 U.S.C. § 547(c)(5), his allegations that the BANK improved its position within 90 days of the bankruptcy filing indicates he is pursuing his claim under that section. Section 547(c)(5) prevents a trustee from avoiding a transfer that creates a perfected security interest in inventory or its proceeds, except to the extent that the creditor improved its position within 90 days of the bankruptcy filing. The issue is not whether the BANK is secured. The issue is whether the BANK improved its secured position during the 90 days prior to the bankruptcy filing. The BANK's motion does not address that issue or otherwise establish that it did not improve its secured position.

■ The BANK also argues that when proceeds from the cattle sales were deposited into the DEBTOR's account that it was a holder in due course under § 3–302 of the Uniform Commercial Code, 810 ILCS § 5/3–302. The holder in due course rule provides no protection to the BANK. The BANK had two relationships with the DEBTOR. One was a depository relationship and the other was a lending relationship. The BANK may well have been a holder in due course for the purposes of the depository relationship. The historical reason for the holder in due course rule was to facilitate the free flow of negotia-

ble instruments in the commercial world by cutting off certain defenses against a holder of a negotiable instrument who was not a party to the transaction giving rise to the negotiable instrument. But, the focus of a preference action is the lender/borrower relationship and the payment of the funds against the debt. The fact that the BANK received them as a holder in due course does not justify it receiving a preference by its application of those funds to its outstanding loan. Applying the holder in due course rule in the manner suggested by the BANK has nothing to do with the reason for the rule. Furthermore, applying it to defeat an alleged preference imposes additional state law elements on a bankruptcy provision. Applying the elements found in § 547 of the Bankruptcy Code, a preference could be found to exist. But, then applying the elements of the holder in due course rule, the preference could be defeated.

■ Finally, the BANK claims the protection of § 547(c)(2) of the Bankruptcy Code, which provides a trustee may not recover a transfer:

[T]o the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms; . . . .

11 U.S.C. § 547(c)(2). Again focusing on the wrong end of the transaction, the BANK contends that the DEBTOR's deposits of the sale proceeds into the livestock account were made in the ordinary course of the DEBTOR's and the BANK's business, according to ordinary business terms. The BANK's argument fails because the exception is not concerned with when the deposit was made, but with when the deposits were taken by the BANK and applied to the loan balance. The deposits could have been in the ordinary course of business, but the takings were not necessarily so. This is unquestionably so as to the depletion of the checking account on

November 7, 1995, leaving only $1.00, with the funds being applied to the BANK's loan. If the transfer had been only of a portion of the deposit account, in the amount of a normal payment on the revolving loan, it may have qualified. But, it was a taking of the whole account, except for $1.00, and the taking occurred after the DEBTOR and the BANK discussed the DEBTOR's possible financial difficulties. The BANK does not address the aspects of the payment made on October 31, 1995, and this Court makes no findings as to the ordinary course of business exception to that payment.

In summary, for the reasons stated above, the motions for summary judgment filed by the BANK against INTERSTATE on the third party complaint and by the BANK on the TRUSTEE's complaint should be DENIED.

This Opinion is to Serve as findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

### ORDER

For the reasons stated in an Opinion filed this day, IT IS HEREBY ORDERED that:

1. The Motion for Summary Judgment filed by COMMUNITY NATIONAL BANK OF MONMOUTH against CHARLES E. COVEY, TRUSTEE, is hereby DENIED;

2. The Motion for Summary Judgment filed by COMMUNITY NATIONAL BANK OF MONMOUTH against INTERSTATE PRODUCERS LIVESTOCK ASSOCIATION on the third party complaint, is hereby DENIED; and

3. The Clerk of the Bankruptcy Court is directed to schedule a status hearing in order to set the matter for trial.